227 P.3d 520

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**Zachariah I. FITZWATER, Petitioner/Defendant–Appellant.**

**No. 28584.**

Supreme Court of Hawai'i.

March 3, 2010.

As Amended April 5, 2010.

Ronette Kawakami and Summer Kupau, Deputy Public Defenders (John M. Tonaki, Public Defender, and Taryn R. Tomasa, Deputy Public Defender, with them on the briefs), for petitioner/defendant-appellant.

Stephen K. Tsushima and Brian Vincent, Deputy Prosecuting Attorneys (Peter B. Car-

lisle, Prosecuting Attorney, with them on the brief), for respondent/plaintiff-appellee.

MOON, C.J., NAKAYAMA, DUFFY, and RECKTENWALD, JJ.; with ACOBA, J., Concurring Separately and Dissenting.

Opinion of the Court by
RECKTENWALD, J.

Petitioner/defendant-appellant Zachariah I. Fitzwater was convicted of excessive speeding in violation of Hawai'i Revised Statutes (HRS) § 291C–105(a)(1) (2007).[1] At Fitzwater's trial in the District Court of the First Circuit (district court),[2] a Honolulu police officer testified that he followed Fitzwater's motorcycle after he observed Fitzwater traveling at what appeared to be a high rate of speed. According to the officer, the speedometer in his police vehicle indicated that Fitzwater was traveling 70 miles per hour in an area where the speed limit was 35 miles per hour. The officer further testified that a "speed check" had been conducted to determine the accuracy of the police vehicle's speedometer about five months before the incident involving Fitzwater. Over the objection of Fitzwater's counsel, a card purporting to document the results of that speed check was admitted into evidence, and the officer was allowed to testify that the results of the speed check showed that the speedometer was accurate.

The Intermediate Court of Appeals (ICA), in a Summary Disposition Order (SDO), concluded that the district court did not err in admitting the speed check evidence. *State v. Fitzwater*, No. 28584, 120 Hawai'i 383, 205 P.3d 648, 2009 WL 1112602, at *1–2 (App. Apr. 27, 2009). Fitzwater then timely sought review in this court.

This appeal requires us to resolve several issues relating to the admission of the speed check evidence. We hold that although the

speed check was conducted with the understanding that its results would likely be used in the prosecution of speeding cases, the card could nevertheless qualify as a record of regularly conducted activity ("business record") under Hawai'i Rules of Evidence (HRE) Rule 803(b)(6), quoted *infra*. However, there was insufficient foundation to admit the card as a business record under that rule, and there was additionally insufficient foundation regarding the reliability of the speed check. Finally, we reject Fitzwater's argument that the admission of the speed check evidence violated his right to confrontation under the Sixth Amendment of the United States Constitution.

Absent the speed check evidence, there was insufficient evidence to establish the accuracy of the speedometer in the officer's vehicle, and to support Fitzwater's conviction for excessive speeding in violation of HRS § 291C–105(a)(1). Accordingly, we vacate the judgments of the ICA and the district court. However, because there was sufficient evidence to establish that Fitzwater was speeding in violation of HRS § 291C–102(a)(1),[3] a lesser included non-criminal traffic infraction, we remand for entry of a judgment that Fitzwater violated that section.

## I. BACKGROUND

### A. Proceedings in the District Court

On May 9, 2007, the State of Hawai'i orally charged Fitzwater with "driving a motor vehicle at a speed exceeding the (indiscernible) speed or (indiscernible) speed limit [by] 30 miles per hour or more in violation of Hawaii Revised Statutes 291C–105(A)(1), driving 70 in a 35 mile-per-hour-zone." Fitzwater pleaded not guilty.

Officer Neal Ah Yat testified that around 11:20 p.m. on the evening of January 24, 2007, he was patrolling Kamehameha High-

1. HRS § 291C–105 states in relevant part:
 **Excessive speeding.** (a) No person shall drive a motor vehicle at a speed exceeding:
 (1) The applicable state or county speed limit by thirty miles per hour or more[.]
 . . . .

2. The Honorable T. David Woo, Jr. presided.

3. HRS § 291C–102 (2007) states in relevant part:

**Noncompliance with speed limit prohibited.** (a) A person violates this section if the person drives:
(1) A motor vehicle at a speed greater than the maximum speed limit other than provided in section 291C–105[.]
. . . .

way near Waipio Uka Boulevard in his blue and white police vehicle. He was parked in a driveway "shooting laser" when four motorcycles passed him "at an extremely high rate of speed." He was not able to get a laser reading on the motorcycles because they were too small, and because there were trees in the way. Ah Yat then attempted to catch up to the motorcycles "to pace [them]." Three of the motorcycles sped up and took off, and Ah Yat testified that it was too dangerous for him to attempt to follow them. He followed the fourth motorcycle, which was being driven by Fitzwater, maintaining a distance of approximately six car lengths directly behind him at a speed of 70 miles per hour for approximately two-tenths of a mile. He checked his speedometer at least three times to confirm that he was traveling at 70 miles per hour. As he was pacing Fitzwater, they passed a 30–mile–per–hour sign and a 35–mile–per–hour sign. Ah Yat stopped Fitzwater and cited him "for excessive speeding, 70 in a 35, as well as no insurance and no license." [4] When Ah Yat informed Fitzwater why he had stopped him, Fitzwater stated that he was "just trying to keep up" with the other motorcycles. [5]

Ah Yat testified a speed check was conducted on his police vehicle by "Jack's Speedo" in August of 2006, although he wasn't sure of the exact day it was done. He testified that a speed check "calibrate[s] the actual speed of the car with the speedometer." He stated that the speed is calibrated so that "we know that our speedometers are accurate, and when we pace vehicles at a certain speed, we know for sure that the vehicle is going that speed." He said speed checks are "taken care of by the vehicle maintenance section [ (VMS),]" which "take[s] the vehicle to the shop[.]" The Deputy Prosecuting Attorney (DPA) asked him if "the speed check [is] conducted in the regular course of maintaining HPD vehicles[,]" to which he responded "[y]es." Ah Yat did not testify about how the checks are done. He testified that they are conducted once a year, and are good for one year. The result of a speed check is recorded "[o]n a card that is given and assigned to each vehicle that shows that at whichever speed it's tested, the vehicle is actually going what the speedometer says it is."

When the DPA asked Ah Yat what the result of the speed check on his vehicle was, defense counsel objected on the ground that the information on the speed check card was inadmissible hearsay. The court overruled the objection based on *State v. Ing*, 53 Haw. 466, 497 P.2d 575 (1972). Defense counsel then argued that *Ing*:

has been qualified substantially by *Crawford v. Washington*, [541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ], as well [as by] the Hawaiʻi companion case, *State v. Grace*, [107 Hawaiʻi 133, 111 P.3d 28 (App. 2005) ], that new foundation requirements imposed by [*Crawford*] and [*Grace*] are not based upon any court rules and/or the Hawaiʻi Rules of Evidence, but are constitutional.

. . .

We argue that the (indiscernible) now requires exclusion of any testimony or statement made by a declarant who is not here to testify (indiscernible) another witness, that absent (indiscernible) statement cannot be elicited from the witness (indiscernible) consequence unless the prosecution shows that first, declarant is quote, unquote unavailable, and there's no (indiscernible) cross-examine.

Although *Crawford* does not (indiscernible), [*Grace*] adopted the test proposing *Crawford* by the National Association of Defense Lawyers (indiscernible) as testimonial (indiscernible) pertinent question is whether an objective observer would reasonably expect the statement to be available for use in prosecution.

I believe Officer Ah Yat has testified that his speed check, they're made to pace cars so they can be used to prosecute speeding cases and *Ing* was decided (indis-

---

4. The district court granted the State's motion to dismiss the no insurance charge, and to nolle prosequi the charge for driving without a license.

5. The district court denied defense counsel's request for a voluntariness hearing on Fitzwater's statement to Ah Yat.

cernible) requirements and that's our objection.

The court overruled the objection, stating that it was "not gonna make any groundbreaking rules on that point until the supreme court rules on it[.]"

When the DPA again asked Ah Yat what the result of the speed check was, defense counsel objected, arguing that the State "did not lay appropriate foundation" for the evidence to be admissible as a business record under HRE Rule 803(b)(6). Defense counsel argued that because Ah Yat testified that "Jack['s] Speedo Shop did the speed check and that somebody in the HPD took it to [the shop] and had it checked[,]" Ah Yat was not a qualified witness or custodian pursuant to HRE Rule 803(b)(6). The court overruled the objection.

Ah Yat then testified that "[t]he highest speed tested [was] at 75 miles per hour [and it] show[ed] that the vehicle was indeed going 75 miles per hour." Ah Yat testified that this meant that if he were pacing a vehicle and his speedometer showed that he was traveling at 70 miles per hour, the other vehicle was in fact traveling at 70 miles per hour.

A copy of the speed check card was admitted into evidence over the objection of defense counsel. Ah Yat identified the card as belonging to his vehicle because it bore his HPD vehicle number. Ah Yat testified that it was a true and accurate copy of the speed check that was on file with the HPD.

On cross-examination, Ah Yat acknowledged that he had not personally taken the vehicle to Jack's Speedo Shop in August 2006 to have the speed check performed, but rather that a member of the HPD's VMS (Ah Yat did not know who) had taken it in. Ah Yat did not talk to anyone at Jack's Speedo about how the test was conducted. He did not recall when he received the speed check card, but added that "it stays with the vehicle." Defense counsel then asked Ah Yat about the purpose of the speed card:

> [defense counsel]: ... [Y]ou testified today that you did these speed checks, so you know that this speedometer in your HPD vehicle (indiscernible), correct?

[Ah Yat]: Yes.

[defense counsel]: And also because when the situation calls for it, you have to pace vehicles to judge their speed, correct?

[Ah Yat]: Yes, sir.

[defense counsel]: And then when you come to court to show, in fact, that your— you use these speed checks to show in court that the vehicle was acting, I mean was calibrated correctly as far as speed?

[Ah Yat]: Yes, sir.

[defense counsel]: So, it's reasonable to state that these speed checks are done and made available for use in prosecuting speeding cases?

[Ah Yat]: I'm sorry, what are you asking, sir?

[defense counsel]: Sir, is it fair to say that these speed checks for HPD vehicles, specifically [for his assigned vehicle], ... are done and are made so that officers such as yourself can use them in prosecuting speeding cases, or you use them in court?

[Ah Yat]: Oh, yes, sir, yes, sir.

. . . .

In response to questions from the court, Ah Yat testified that he had been driving his HPD vehicle "[a]lmost every night" for approximately a year, that the speedometer appeared to have been operating normally during that year, and that he had never observed anything unusual about the way the speedometer operated. After a brief re-cross-examination of Ah Yat, the State rested.

Defense counsel moved for judgment of acquittal, arguing again that *Crawford* and *Grace* precluded the admission of the speed check, and that the State did not lay the proper foundation for it to be admitted as a business record under HRE Rule 803(b)(6). The court denied the motion, finding that "it is a requirement, a rule of [HPD] that these automobiles get speed checked once a year and that this is done by the maintenance section and that its records are kept in the regular course of business by the maintenance section, and therefore, it does qualify as a business record."

Fitzwater testified that the motorcycle belonged to a friend of his. On the evening in question, the owner of the motorcycle was intoxicated, and wanted to ride his motorcycle home. Fitzwater stopped him from doing so, and decided to take his friend's bike home for him. Two friends joined him on the ride on their motorcycles. Fitzwater testified that he rode in front of his friends for safety reasons, because he did not have a helmet with him and they would be able to help him if he fell. While they were riding, an unidentified driver on a sports bike similar to the one Fitzwater was riding "flew by [them] going about a hundred miles an hour[.]" After that driver "buzzed [them]," a police officer pulled out and traveled behind them. Fitzwater testified that he didn't "look at the speedometer really often[,]" but estimated that he was traveling at about 50 miles per hour in a zone that changed from a 45–to a 35–mile–per–hour speed limit. The officer then passed Fitzwater and his two friends on the left, cut in front of them, and pulled Fitzwater over. Fitzwater speculated that he was pulled over because the officer confused him with the fourth motorcyclist. He did not recall telling Officer Ah Yat that he was trying to keep up with the other motorcyclists.

The defense again moved for a judgment of acquittal on the same grounds, and the court ruled in relevant part as follows:

[T]he defense may have some argument about the *Crawford,* about whether or not *Crawford* makes inroads into *State v. Ing* and also some arguments about the foundation. I don't really think that that case impacts *Ing* as much as defense counsel thinks because[ ] [t]he (indiscernible) of *Ing* was that devices such as speedometers are generally accurate and they can be relied upon by the courts to indicate speeds.

In fact, if you read carefully as the court seems to indicate, the speed check is merely the frosting on the cake[,] that it goes to the weight of the evidence as to beyond a reasonable doubt and it's actually the officer's observation of the speedometer that is the important event, important fact, operative fact in the case.

The Court finds that this officer operated his patrol car for well over a year, almost daily. He observed the operation of the speedometer, found that it seemed to be operating normally at all times, and on this particular day, the Court finds that when you take that into account that he paced the defendant at 70 miles an hour, that is a reasonably accurate clocking and irrespective of what Jack's Speedo Shop may say.

Court also finds that there is this speed check and that the speed was, the speed of that officer's vehicle was calibrated at both 65 miles an hour and at 75 miles an hour, both speeds found to be accurate. The Court finds that the defendant's speed was 70 miles an hour beyond a reasonable doubt.

It appears that there are certain things the defendant did that night that would indicate a reckless state of mind, driving without a helmet, driving without closed-toed shoes.

. . .

And the Court finds that that high rate of speed of 70 in a 35 is evidence of a reckless state of mind, which satisfies the requirement of intent in this case. I therefore[ ] find that the State has proven its case beyond a reasonable doubt. I find the defendant guilty as charged.

The court entered judgment on May 9, 2007, sentencing Fitzwater to pay a $500 fine, a $75 driver education assessment, a $25 neurotrauma fee, and a $30 criminal injuries fund fee. The court also ordered Fitzwater to complete a driver's education improvement course and to perform 36 hours of community service. The court also suspended Fitzwater's license for 30 days, but permitted Fitzwater to drive to and from work and the driver's educational requirements imposed by the court during the second half of the suspension. Fitzwater timely filed a notice of appeal on June 5, 2007.

**B. Proceedings in the Intermediate Court of Appeals**

Fitzwater raised four issues on appeal to the ICA. First, Fitzwater contended that the

district court erred in qualifying the speed check card as a business record, since the card was prepared with the expectation that it would be used in litigation. Thus, according to Fitzwater, the card fell within the scope of the principle recognized by the Supreme Court in *Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), which held that an accident report prepared by a railroad employee was not a business record because it was not made in the regular course of business. Fitzwater also argued that the district court erred in relying on *Ing*, since that decision was based on a statute that had since been repealed and replaced by HRE Rule 803(b)(6).

The State responded that "nothing about the language of H.R.E. Rule 803(b)(6) . . . makes the holding in *State v. Ing* inapplicable to the instant issue," and that *Ing* stands for the proposition that "records of the routine and regular testing of the speedometers on police vehicles [are] admissible not only to prove that such tests ha[ve] been made but also as evidence of the accuracy of the speedometers."

Second, Fitzwater argued that even if the speed check card was a record of a regularly conducted activity within the meaning of HRE Rule 803(b)(6), there was insufficient foundation for its admission. The State responded that a sufficient foundation had been established by Ah Yat's testimony pursuant to *Ing* and HRE Rule 803(b)(6), since Ah Yat "explain[ed] that the speed check card was kept in the ordinary course of HPD's business and made at or near the time of the speeding incident. . . ."

Third, Fitzwater argued that the admission of the card violated his right to confrontation under the Sixth Amendment of the United States Constitution and article I, section 14 of the Hawai'i Constitution. He argued that although *Ing* had found that admission of information contained on a speed check card did not violate the defendant's right to confrontation, *Crawford v. Washington* had effectively overruled *Ing* and required testimony from the person who conducted the speed check and created the card.

In response, the State argued that unlike the statements in *State v. Grace*, 107 Hawai'i 133, 111 P.3d 28 (2005), in which the ICA held that the statements of two witnesses to a police officer that they saw the defendant hitting his wife were testimonial in nature under *Crawford*, the "information contained within the speed check card was specific to the vehicle operated by Officer Ah Yat and not to any particular individual . . . and a record of the results [of the speed check was not] made in specific anticipation of [Fitzwater's] trial."

Finally, Fitzwater argued that the district court erred in permitting improper testimony by Officer Ah Yat. Fitzwater contended that Ah Yat gave what amounted to expert testimony about the speed check, but was not qualified to do so. Fitzwater also argued that the State failed to establish sufficient foundation to show that the speedometer had been properly calibrated, citing *State v. Wallace*, 80 Hawai'i 382, 910 P.2d 695 (1996) and *State v. Manewa*, 115 Hawai'i 343, 167 P.3d 336 (2007). The State responded that the speed check evidence was admissible pursuant to *Ing*, and that in any event Ah Yat's testimony that he had been driving his vehicle almost every night for a year and that the speedometer had always appeared to be operating normally was itself sufficient to support the conviction.

The ICA resolved those four issues as follows in its SDO:

> (1) The district court did not err by admitting the speed check card as a business record under HRE Rule 803(b)(6). . . . (2) The district court did not err in overruling Fitzwater's objection to the foundation for the speed check card as a business record. . . . (3) Admission of the speed check card was not a violation of Fitzwater's right of confrontation . . . [and] (4) We decline to consider Fitzwater's final point as he failed to object to the testimony of Officer Ah Yat on the ground that it was improper expert testimony.

*State v. Fitzwater*, No. 28584, 2009 WL 1112602, at *1–2.

On May 12, 2009, the ICA entered its judgment affirming the district court's judgment.

### C. Application for Writ of Certiorari

In his August 3, 2009 application for writ of certiorari (Application), Fitzwater raised the following questions:

1. Whether the ICA gravely erred in holding that the speed check card qualified as a business record.

2. Whether the ICA gravely erred in holding that the State adduced sufficient foundation to admit the speed check card as a business record.

3. Whether the ICA gravely erred in holding that admission of the speed check card was not a violation of Fitzwater's right of confrontation under either the Hawaii Constitution or the United States Constitution.

4. Whether the ICA gravely erred in failing [to] address, as a matter of plain error, that Officer Ah Yat's testimony constituted improper expert testimony.

The State did not file a response.

## II. STANDARDS OF REVIEW

### A. Application for a Writ of Certiorari

The acceptance or rejection of an application for a writ of certiorari is discretionary. HRS § 602–59(a) (Supp.2009). In deciding whether to accept an application, this court reviews the decisions of the ICA for (1) grave errors of law or of fact or (2) obvious inconsistencies in the decision of the ICA with that of the supreme court, federal decisions, or its own decisions and whether the magnitude of such errors or inconsistencies dictate the need for further appeal. HRS § 602–59(b).

### B. Admissibility of Hearsay

■ "Where admissibility of evidence is determined by application of the hearsay rule, there can only be one correct result, and the appropriate standard for appellate review is the right/wrong standard." *State v. Machado,* 109 Hawai'i 445, 450, 127 P.3d 941, 946 (2006) (citation omitted); *State v. Jhun,* 83 Hawai'i 472, 477 & n. 4, 927 P.2d 1355, 1360 & n. 4 (1996) (applying de novo review to admissibility of evidence under HRE Rule 803(b)(8), but noting that the question of whether there was evidence of a "lack of

trustworthiness" under the rule would be reviewed for abuse of discretion).

### C. Right of Confrontation

■ "We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. Thus, we review questions of constitutional law under the 'right/wrong' standard." *State v. Fields,* 115 Hawai'i 503, 511, 168 P.3d 955, 963 (2007) (citation and ellipsis omitted).

■ "Violation of the constitutional right to confront adverse witnesses is subject to the harmless beyond a reasonable doubt standard." *State v. Balisbisana,* 83 Hawai'i 109, 113–14, 924 P.2d 1215, 1219–20 (1996). When the court applies this standard, "the court is required to examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction." *Id.* at 114, 924 P.2d at 1220 (internal quotation marks and citation omitted).

## III. DISCUSSION

### A. The circumstances of the creation of the speed check card did not preclude its admission as a business record under HRE Rule 803(b)(6)

■ In his Application, Fitzwater first argues that the speed check card was inadmissible as a business record under HRE Rule 803(b)(6) because it was created for the purposes of litigation, citing *Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), and *Melendez–Diaz v. Massachusetts,* —— U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). For the reasons set forth below, we reject this argument.

HRE Rule 803(b)(6) (1993 & Supp.2002) states in relevant part:

> **Hearsay exceptions; availability of declarant immaterial.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (b) Other exceptions.
>
> . . . .

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made in the course of a regularly conducted activity, at or near the time of the acts, events, conditions, opinions, or diagnoses, as shown by the testimony of the custodian or other qualified witness, or by certification that complies with rule 902(11) or a statute permitting certification, unless the sources of information or other circumstances indicate lack of trustworthiness.

. . . .

Thus, a record that is otherwise admissible under HRE Rule 803(b)(6) may nevertheless be inadmissible if "the sources of information or other circumstances indicate [a] lack of trustworthiness." *See* Addison M. Bowman, *Hawaii Rules of Evidence Manual* § 803–3[5][D] (2008–2009 ed.) ("internal reports concerning events likely to generate litigation, offered by the organization that produces them, should be subject to routine scrutiny under rule 803(b)(6)'s untrustworthiness qualification") (hereinafter *HRE Manual*); *see also* 2 Kenneth S. Broun et al., *McCormick on Evidence* § 288 at 312 (6th ed. 2006) ("When records are prepared in anticipation of litigation, they will often, but not always, demonstrate that lack of trustworthiness.") (hereinafter *McCormick on Evidence*).

We review the district court's determination of untrustworthiness for abuse of discretion. *See* HRE Rule 803 cmt. (the "preliminary determination of the trustworthiness of such records is discretionary with the court"); *McCormick on Evidence* § 288 at 311 (trial courts have a "discretionary power" to exclude evidence that meets the letter of the business records exception to the hearsay rule, but "which under the circumstances appear[ ] to lack the reliability that business records ordinarily have"); *cf. Jhun*, 83 Hawai'i at 478 & n. 4, 927 P.2d at 1361 & n. 4 (noting that the question of whether there was evidence of a "lack of trustworthiness" under HRE Rule 803(b)(8) would be reviewed for abuse of discretion).

The United States Supreme Court considered what constitutes a statement made "in the regular course" of business in *Palmer*. 318 U.S. at 111, 63 S.Ct. 477. The plaintiff, in his individual capacity and as the administrator of his wife's estate, brought several causes of action against a railroad company after he and his wife were involved in a railroad accident. 318 U.S. at 110, 63 S.Ct. 477. Palmer, who had been an engineer of the train involved in the accident, died prior to trial, and the Supreme Court considered whether his signed statement to a representative of the railroad and state public utility commission subsequent to the accident was admissible as a "writing or record ... made in ... the regular course of such business[.]" *Id.* at 111 n. 1, 63 S.Ct. 477. The Supreme Court, interpreting a federal statute that allowed the admission of business records, held that the report was not made "in the regular course" of business and was inadmissible hearsay, stating that:

[The report] is not a record made for the systematic conduct of the business as a business. An accident report may affect that business in the sense that it affords information on which the management may act. It is not, however, typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls.

. . .

In short, it is manifest that in this case those reports are not for the systematic conduct of the enterprise as a railroad business. Unlike payrolls, accounts receivable, accounts payable, bills of lading and the like[,] these reports are calculated for use essentially in the court, not in the business. Their primary utility is in litigating, not in railroading.

*Id.* at 113–14, 63 S.Ct. 477.

Fitzwater argues that Ah Yat's agreement that "it's reasonable to state that these speed checks are done and made available for use in prosecuting speeding cases" means that the speed check card was prepared in anticipation of litigation like the report in *Palmer*, and thus it should not be admissible under

HRE Rule 803(b)(6). However, the circumstances of the creation of the speed check card here are quite different from those in *Palmer* and other cases in which documents have been held inadmissible as business records. Such documents were found to be inadmissible because they were created in response to a historical occurrence, and in anticipation of litigation on that specific incident. Since they were created with the motivation of prevailing against a particular party, their trustworthiness was inherently questionable. *See Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 204–05 & n. 2 (4th Cir.2000) (accident report was not admissible as a business record even if prepared by an outside investigator because the primary motive for creating the report was to prepare for litigation of this particular case, and documents prepared for use in specific litigation are "dripping with motivations to misrepresent") (citation omitted); *Timberlake Const. Co. v. U.S. Fidelity & Guar. Co.*, 71 F.3d 335, 336, 342 (10th Cir.1995) (trial court erred in admitting letters that were sent by a party in an insurance coverage dispute that arose after a fire at a Wal–Mart store; appeals court observes that the letters "have all the earmarks of being motivated and generated to further [the party's] interest, with litigation actually not far around the corner"); *Echo Acceptance Corp. v. Household Retail Services, Inc.*, 267 F.3d 1068, 1090–91 (10th Cir.2001) (upholding the trial court's refusal to admit business correspondence which constituted legal "posturing" drafted by lawyers in anticipation of litigation); *Hardy v. State*, 71 S.W.3d 535, 537 (Tex.App.2002) (in a case involving theft of hydraulic pumps, the court held that a letter from the pump manufacturer to a local district attorney issued on request from police officers confirming that the manufacturer had sold the pumps was not a business record because "the document was created solely for the purpose of prosecuting criminal charges against appellant").

Thus, the speed check card at issue here is distinguishable from the accident report in *Palmer* and the documents discussed in the foregoing cases. While those documents were created solely for the purposes of litigation in a particular case, the speed check card here was not created for use in a particular dispute. Rather, the speed check card is more akin to documents that reflect the results of regularly conducted tests, which have been held to be admissible as business or government records even if they are frequently used in litigation. *See State v. Ofa*, 9 Haw.App. 130, 135–36, 828 P.2d 813, 816–17 (1992) (evidence of intoxilyzer log which reflected "testing of the Intoxilyzer for accuracy on the specified dates constituted a record of routine, nonadversarial matters made in a nonadversarial setting" and was therefore admissible as a government record under HRE Rule 803(b)(8)); *State v. Ali*, 679 N.W.2d 359, 367 (Minn.Ct.App.2004) (in a speeding case, the court held that records certifying the accuracy of the officer's laser gun qualified as business records even though the officer testified that the certificates were issued to police officers to use in later court proceedings because the officer also testified "that the certification document was created in the regular course of the department's business to ensure that the laser is accurately measuring speed and meeting the manufacturer's specifications ...") (internal quotations omitted); *Bohsancurt v. Eisenberg*, 212 Ariz. 182, 129 P.3d 471, 476 (Ct.App.2006) (calibration and maintenance records of breath-testing machine fell within the business records exception "because [they] contain factual memorializations generated by a scientific machine, and the records are prepared by technicians who are not proxies of police investigators and have no demonstrable interest in whether the certifications produce evidence that is favorable or adverse to a particular defendant ....") (internal quotations and citations omitted).

Although Ah Yat testified that speed check cards were created with the understanding that they would be used in prosecuting speeding cases, the card at issue here was created in a non-adversarial setting about five months prior to the alleged speeding incident, and was not created for the specific purpose of prosecuting Fitzwater. Thus, the circumstances of its creation did not preclude its admission as a business record under HRE Rule 803(b)(6).

*Melendez–Diaz* is consistent with this analysis. *Melendez–Diaz* involved a narcotics prosecution, in which the state introduced sworn statements from laboratory analysts which stated the weight of the substances recovered during the investigation of the defendant and confirmed that they contained cocaine. 129 S.Ct. at 2530–31. Citing *Palmer*, the Court noted that "[d]ocuments kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status ... [b]ut that is not the case if the regularly conducted business activity is the production of evidence for use at trial." *Id.* at 2538. The court observed that the affidavits would not qualify as traditional "official or business records," *id.*, noting that the analysts had "create[d] a record for the sole purpose of providing evidence against a defendant" and that the records had been "prepared specifically for use at petitioner's trial[.]" *Id.* at 2539–40.

■ Thus, the circumstances in *Melendez–Diaz* were different from those here, where the document was not created specifically for the prosecution of Fitzwater. We therefore conclude that a speed check card can be properly admitted into evidence as a business record if the proper foundation is laid.

**B. The State did not establish a sufficient foundation to admit the speed check card as a business record under HRE Rule 803(b)(6)**

■ At trial, Fitzwater objected to the admission of Ah Yat's testimony about the results of the speed check, and to the admission of the speed check card itself. Fitzwater argued that this evidence was hearsay, and that there was insufficient foundation for its admission since Ah Yat was not a "qualified witness" who could properly authenticate

the card as a business record under HRE Rule 803(b)(6). The district court admitted the testimony and the card over Fitzwater's objection.

In his application to this court, Fitzwater notes, inter alia, that Ah Yat did not take the vehicle to the shop, was not present when the card was created, and had no personal knowledge about the calibration testing.

In order for a record to be admissible under HRE Rule 803(b)(6), the proponent must establish a sufficient foundation. Specifically,

> [t]he proponent must establish (1) that the record evidences "acts, events, conditions, opinions, or diagnoses"; (2) that the record was made in the course of a regularly conducted activity; and (3) that the record was made "at or near the time" of the acts or events that are recorded.

*HRE Manual* § 803–3[5][B]; *see* HRE Rule 803(b)(6).

Furthermore, "[t]he record must also survive the discretionary untrustworthiness exclusion of the rule." *HRE Manual* § 803–3[5][B].

The necessary foundation can be established "by the testimony of the custodian or other qualified witness, or by certification that complies with rule 902(11) [6] or a statute permitting certification...." HRE Rule 803(b)(6). Therefore, a speed check card such as the one here can be authenticated by: (1) the testimony of the custodian of the card, (2) testimony from a qualified witness, or (3) a certification that complies with HRE Rule 902(11) or other statute permitting certification. The record here does not include such a certification, nor does the record reflect that Ah Yat was testifying as a custodian of

---

6. HRE Rule 902(11) (1993 & Supp.2008) provides that:

> The original or a duplicate of a domestic or foreign record of regularly conducted activity that would be admissible under rule 803(b)(6), if accompanied by a written declaration of its custodian or other qualified person, certifying that the record was:
> (A) Made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

> (B) Kept in the course of the regularly conducted activity; and
> (C) Made by the regularly conducted activity as a regular practice.
> The declaration shall be signed in a matter that, if falsely made, would subject the maker to a criminal penalty under the laws of the state or country where the declaration is signed....

the speed check card. Rather, it appears that Ah Yat's testimony was offered as the testimony of a qualified witness in order to authenticate the speed check card.

 A person can be a "qualified witness" who can authenticate a document as a record of regularly conducted activity under HRE Rule 803(b)(6) or its federal counterpart even if he or she is not an employee of the business that created the document, or has no direct, personal knowledge of how the document was created.[7] As one leading commentator has noted:

> ... The phrase "other qualified witness" is given a very broad interpretation. The witness need only have enough familiarity with the record-keeping system of the business in question to explain how the record came into existence in the ordinary course of business. The witness need not have personal knowledge of the actual creation of the documents or have personally assembled the records. In fact, the witness need not even be an employee of the record-keeping entity as long as the witness understands the entity's record-keeping system.

There is no requirement that the records have been prepared by the entity that has custody of them, as long as they were created in the regular course of some entity's business.

The sufficiency of the foundation evidence depends in part on the nature of the documents at issue. Documents that are "standard records of the type regularly maintained by firms in a particular industry may require less by way of foundation testimony than less conventional documents proffered for admission as business records."

5 Joseph McLaughlin, *Weinstein's Federal Evidence* § 803.08[8][a] (2d ed.2009) (footnotes omitted).

Thus, an employee of a business that receives records from another business can be a qualified witness who can establish a sufficient foundation for their admission as records of the receiving business under HRE Rule 803(b)(6). Courts and commentators have articulated the necessary showing in such circumstances in different ways. For example, another leading commentator notes that "reliance by the organization on records created by others, although an important part of establishing trustworthiness, without more is not sufficient." *McCormick on Evidence* § 292 at 318. This commentator goes to add that "when the business offering the records of another has made an independent check of the records, has integrated them into their own business operation in a way that establishes trustworthiness or contains other assurances of trustworthiness, or can establish accuracy by other means, the nec-

---

**7.** Federal Rules of Evidence (FRE) Rule 803(6) provides that the following is not excluded by the hearsay rule:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

There are several differences between HRE Rule 803(b)(6) and FRE Rule 803(6). For example, the federal rule explicitly requires that the record be created by a person with knowledge or from information transmitted by a person with knowledge, whereas HRE Rule 803(b)(6) does not explicitly include that requirement. Additionally, the federal rule requires that the record be both (1) kept in the course of regularly conducted activity and (2) made as part of the regular practice of the business activity, whereas HRE Rule 803(b)(6) has a single requirement that the record be made in the course of a regularly conducted activity.

Although cases interpreting provisions in the Federal Rules of Evidence are of course not binding on us, we may refer to them for their persuasive authority in interpreting similar provisions of the Hawaii Rules of Evidence. *Jhun*, 83 Hawai'i at 478, 927 P.2d at 1361.

essary foundation may be established." *Id.* at 318–19.

In *Air Land Forwarders, Inc. v. United States,* 172 F.3d 1338 (Fed.Cir.1999), the United States Court of Appeals for the Federal Circuit considered whether a document created by one business and incorporated into the records of another can be admitted as a business record of the incorporating business. The documents in question were repair estimates that had been prepared by third parties and submitted to the military by service members whose household goods had been damaged by movers, and who had filed claims with the military seeking compensation for the damage. *Id.* at 1340. The trial court admitted the repair estimates as business records of the military under FRE Rule 803(6). *Id.* at 1340–41.

On appeal, the Federal Circuit surveyed cases from other circuits, and concluded that when an organization incorporates records of another entity into its own records, those records are admissible when the incorporating entity "relied upon those records in its day-to-day operations, and where there are other strong indicia of reliability." *Id.* at 1344; *see People v. Markowitz,* 187 Misc.2d 266, 721 N.Y.S.2d 758, 761–62 & 762 n. 2 (N.Y.Sup.Ct.2001) (*Air Land* requires "that the incorporating business rely upon the accuracy of the document incorporated, and ... there are other circumstances indicating the trustworthiness of the document"; court notes that *Air Land* follows previous rulings in the First, Second, Third, Fifth, Ninth and Eleventh Circuits). The court held that the test was satisfied since the military incorporated the repair estimates into its own records, relied on them in paying claims, and there were other indicia of reliability, including the fact that service members were subject to criminal penalties for submitting false claims. *Air Land,* 172 F.3d at 1343–44.

The court in *Air Land* did not specifically indicate whether the existence of reliance by the incorporating entity and the presence of other indicia of reliability was sufficient to qualify an incorporated record for admission as a business record under FRE Rule 803(6), or whether the other foundational requirements outlined by the rule must also be satisfied. However, other courts addressing the admissibility of records under these circumstances have indicated that the requirements of Rule 803(6) must still be met. *See, e.g., United States v. Childs,* 5 F.3d 1328, 1333 (9th Cir.1993) (noting that "several circuits have held that exhibits can be admitted as business records of an entity, even when that entity was not the maker of those records, so long as the other requirements of Rule 803(6) are met and the circumstances indicate the records are trustworthy"); *Bell v. State,* 176 S.W.3d 90, 92–93 (Tex.App.2004) (articulating a test similar to that in *Air Land,* whereby a document prepared by one business and incorporated by another may be admissible as a business record of the incorporating business if: "(1) it is incorporated and kept in the course of the testifying witnesses' business; (2) that business typically relies upon the accuracy of the contents of the document; and (3) the circumstances otherwise indicate the trustworthiness of the document"; the court held that records of the incorporating entity were admissible as business records because this test was satisfied and because the witness from the incorporating business testified that the records were "kept in the regular course of its business, and that [they] were created at or near the time" of the events described in them) (citing *Harris v. State,* 846 S.W.2d 960, 963–64 (Tex.App.1993)); *Columbia First Bank v. United States,* 58 Fed.Cl. 333, 339 (Fed.Cl. 2003) (holding that "when a document produced by a third party is incorporated into the business records of another entity this circuit applies [the *Air Land* test] of reliability in order to admit a record that has an otherwise appropriate foundation[,]" since the business records "exception may be applied to documents incorporated in the records of the parties, if the *Air Land Forwarders* test and the regularity criteria [of FRE Rule 803(6) ] have been satisfied.").

■ These cases represent a reasonable approach to authenticating documents in this situation. Thus, we hold that when an entity incorporates records prepared by another entity into its own records, they are admissible as business records of the incorporating entity provided that it relies on the records,

there are other indicia of reliability, and the requirements of HRE Rule 803(b)(6) are otherwise satisfied. The requirements of (1) reliance, and (2) indicia of reliability do not supplant the provisions of the rule; rather, we view them as necessary in these circumstances to satisfy the rule's requirement that the records were "made in the course of a regularly conducted activity" of the incorporating entity. HRE Rule 803(b)(6); *see* *HRE Manual* § 803–3[5][B].

In the instant case, the record does not clearly establish how the speed check card was produced. It appears, from Officer Ah Yat's testimony, that it is HPD's practice to have speed checks conducted on its vehicles on an annual basis. According to Ah Yat, those checks are "taken care of" by HPD's VMS during the regular course of maintaining HPD's vehicles. He testified that the VMS takes these vehicles "to the shop" to calibrate the speedometer, and "someone takes accurate records" of the test, which are recorded on a card that is placed in the vehicle. Ah Yat did not know how the checks are done, and did not testify about who actually performed the test at issue other than it "was done by Jack's Speedo."

Ah Yat testified that State's Exhibit 1 was an accurate copy of the card that was in the vehicle he was driving on the night that he cited Fitzwater. Exhibit 1 is entitled "Jack's Speedo Shop[.]" The next line contains the notation "Honolulu, Hawaii," and a blank which was filled in with the handwritten notation "8–9–06," beneath which appears the handwritten notation "Exp 8–9–07". The card contains the printed statement "To Whom It May Concern: THIS IS TO CERTIFY THAT THE Speedometer of ____ No. ____ Was tested and found to be registering ___ Miles [ ] at ___ M.P.H.[,]" with spaces for a number of readings. The card was filled in with handwritten notations identifying the vehicle as Ford No. HPD 1040, and with varying speedometer readings. There is a line at the bottom which appears to contain a handwritten signature.

As the ICA noted in its SDO, Ah Yat's testimony was not a "model of clarity." *State v. Fitzwater,* No. 28584, 2009 WL 1112602, at *1. The most plausible interpretation of his testimony is that someone at Jack's Speedo, which is apparently a private shop, performed a test, created the card to document the results of that test, and then gave that record to someone from HPD's VMS. We will assume for purposes of argument that such was the case,[8] and analyze the evidence accordingly.

■■■■ Ah Yat's testimony was sufficient to satisfy several of the requirements of HRE Rule 803(b)(6) in order to admit the card as a business record of HPD. First, the speed check card is a "record" documenting the "act[ ]" or "event[ ]" of calibrating Ah Yat's vehicle's speedometer. HRE Rule 803(b)(6). Second, there is sufficient evidence that the card was created "at or near the time" of the speed check. *Id.* Ah Yat testified that the check was "good" for a year, and that it was performed in August 2006. The card itself contains the handwritten notation "8–9–06," beneath which was written "Exp. 8–9–07". The notations on the card, together with Ah Yat's testimony that the check was "good" for a year, support the inference that the speed check was performed on or about August 9, 2006, and that the card was created on or about that date. *See River Dock & Pile, Inc. v. O & G Indus.,* 219 Conn. 787, 595 A.2d 839, 845 (1991) (relying on notations on document to establish that it was created at or near the time of the act described); *White Industries v. Cessna Aircraft Co.,* 611 F.Supp. 1049, 1060 (W.D.Mo.1985) (foundation for admissibility of document under FRE Rule 803(6) must come "from some appropriate source-from the document itself, or from external evidence (either direct or circumstantial or both), or from some combination of these things").

■■■■ Finally, in order to determine whether Ah Yat's testimony was sufficient to

---

8. We note, however, that Ah Yat's testimony leaves open the possibility that someone from HPD's VMS actually performed the test using equipment located at Jack's Speedo, and/or documented the results of the test using Exhibit 1.

To the extent that such uncertainty exists in the record, it indicates that "the sources of information or other circumstances indicate lack of trustworthiness" concerning the authenticity of the document. HRE Rule 803(b)(6).

establish that the card was "made in the course of a regularly conducted activity[,]" HRE Rule 803(b)(6); *see HRE Manual* § 803–3[5][B], we consider whether the State established that HPD incorporated the speed check card into its records and relied on it, and whether there were additional indicia of reliability. Ah Yat's testimony was sufficient to establish that the card was incorporated into the records of HPD. Ah Yat was familiar with HPD's procedures for handling speed check cards, i.e., that the original of the card is kept in the vehicle to which it relates. Even though Ah Yat was not the person who actually put the card into the car, his familiarity with the procedure is sufficient. His testimony also established that HPD relies upon speed check cards such as the one at issue here in its day-to-day operations in order to ensure that the speedometers in HPD vehicles are accurate.

However, Ah Yat's testimony did not adequately establish that there were other indicia of reliability. Ah Yat's testimony did not sufficiently establish that anyone at Jack's was under a business duty to accurately calibrate the vehicle's speedometer and to record the results, or that there are other reasons to conclude that the card was reliable. *Cf.* HRE Rule 803(b)(6) cmt. (recognizing that the "hallmark of reliability" is the "regularity and continuity which produce habits of precision, [the] actual experience of business in relying upon [the records], [and the] duty to make an accurate record as part of a continuing job or occupation.") (quoting FRE 803(6), Advisory Committee's Note) (brackets in original).

In determining whether records that were created by one entity and incorporated into the records of another entity exhibit indicia of trustworthiness and are admissible, some courts have found it significant that the entity that created the documents did so in connection with a contractual obligation owed to the second entity. For example, in *White Industries v. Cessna Aircraft Co.,* 611 F.Supp. 1049, 1060 (W.D.Mo.1985), the court held that it would admit forms that had been created by retail aircraft dealers and submitted to the defendant aircraft manufacturer as part of their ongoing contractual relationship.

The court noted that FRE Rule 803(6) required that each party who is involved in the creation of a business record be under a business duty to report the information reflected on the document, and that such a duty could be imposed on the creating entity as part of a contractual relationship with the receiving entity. *Id.* at 1061 (noting that "a business entity's interest in receiving information can be quite as easily found in a continuing contractual requirement for the same as in a directive to employees, as least when the receiving entity customarily uses and relies on that information"); *see Markowitz,* 721 N.Y.S.2d at 761 (noting, in a theft case involving the admissibility of records of an employer which incorporated records of a bank with whom the employer had a contractual relationship, that "a receiving entity's employee may provide sufficient foundation testimony for a record from a second entity, even though the employee cannot relate the other entity's specific record making practices, if the employee is well familiar with the circumstances under which the record is prepared, if the record is prepared on behalf of the receiving entity and in accordance with its requirements, and if the receiver routinely relies on such records"); Donald I.J. Kelso, *C.R.E. 803(6): Applying the Business Records Exception to Third–Party Information,* 29 Colo. Law. 55 (May 2000) ("[W]hen third-party information or records have been provided as part of a business relationship between a business and the third party, the third party's information has been considered admissible as a business record of the recipient.").

Therefore, in the instant case, the existence of a contractual relationship between HPD and Jack's for the performance and documentation of the tests would be a significant factor in establishing the necessary indicia of trustworthiness. *White,* 611 F.Supp. at 1060; *Markowitz,* 721 N.Y.S.2d at 761. However, Ah Yat's testimony was too vague to suffice, where Ah Yat testified that HPD vehicles are taken "to the shop" once a year, but did not indicate that there was any contractual relationship that would require the shop to accurately conduct and record the speed check. Thus, the State failed to establish a sufficient foundation for the admission

of the speed check card under HRE Rule 803(b)(6), and the district court erred in admitting the card.

The State suggested in its ICA brief that *State v. Ing* supports the admission of the speed check card. The defendant there was convicted of speeding, based on a police officer's testimony that he had paced the defendant's vehicle using his police car, and found it to be exceeding the speed limit by at least 25 miles per hour. *Ing*, 53 Haw. at 466–67, 497 P.2d at 576. The officer testified that "the vehicle he used on that occasion had a speedometer check for accuracy and that the vehicle is maintained by the City and County"; and that the check card indicated that the speedometer read about three miles per hour fast at 55 miles per hour. *Id.* at 467, 497 P.2d at 576. The card was not admitted into evidence. On appeal, the defendant argued that the officer's testimony concerning the results of the speed check was hearsay, and that its admission violated his right to confrontation. *Id.* at 467, 497 P.2d at 576–77.

With regard to the admission of the card, this court cited to HRS § 622–5 and concluded that "[w]here regular tests are made and the records of the tests are kept by the City and County or the police department the card can be introduced as an ordinary business entry of evidence of such record indicating the routine testing of speedometers." [9] *Id.* at 468, 497 P.2d at 577. We observed that the "testimony relative to the speed test bore indicia of reliability" and that the defendant "failed to adduce evidence bringing to issue the accuracy of the speedometer[.]" *Id.* We also held that the admission of the card did not violate the defendant's rights under the confrontation clause. *Id.*

*Ing* does not specifically address many of the foundational requirements required for admission of a document under HRE Rule 803(b)(6). Indeed, it is not clear from the opinion whether the speed check was conducted at HPD or at a private shop, who created the record, and whether it was created at or about the time of the test. Thus *Ing* has limited precedential value in this context, and to the extent it conflicts with the analysis set forth here, it is overruled.

Accordingly, the district court erred in concluding that there was sufficient foundation for the admission of the speed check card under HRE Rule 803(b)(6).

## C. The admission of the card did not violate Fitzwater's right of confrontation under the U.S. Constitution

Fitzwater argues that even if the speed check card is admissible as a business record under HRE Rule 803(b)(6), the State's failure to call the declarant whose statements are reflected on the card to testify at trial violated his right to confrontation under the Sixth Amendment of the United States Constitution.[10] Specifically, he argues that the holding in *Melendez–Diaz* compels the conclusion that the speed check card was testimonial hearsay that was subject to the right of confrontation. In light of our holding that the State failed to establish a sufficient foundation to admit the speed check card as a business record under HRE 803(b)(6), we need not address this argument for the purposes of this appeal. However, we recognize the need to provide guidance on this issue in order to prevent "serious judicial mistakes" in the future, *Kapuwai v. City and*

9. HRS § 622–5 (1976), which was repealed in 1980, provided:

A record of an act, condition, or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition, or event, and if, in the opinion of the court or person having authority to hear, receive and examine evidence, the sources of information, method, and time of preparation were such as to justify its admission.

The term "business" includes every kind of business, profession, occupation, calling, or

operation of institutions, whether carried on for profit or not.

The commentary to HRE Rule 803 notes that section (b)(6) was based upon HRS § 622–5 and FRE Rule 803(b)(6). HRE Rule 803 cmt.

10. Although Fitzwater's Application and Opening Brief suggest that the admission of the card also violated his rights under the Hawai'i Constitution, he did not provide any argument on that point and accordingly we do not address it here. Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(7) ("Points not argued may be deemed waived.").

*County of Honolulu,* 121 Hawai'i 33, 42, 211 P.3d 750, 759 (2009) (citing *State v. Fields,* 67 Haw. 268, 276, 686 P.2d 1379, 1386 (1984)), especially since the issue is likely to reoccur, *see State v. Mahoe,* 89 Hawai'i 284, 285, 972 P.2d 287, 288 (1998) (addressing an issue not necessary for the disposition of the case "because it raises a novel issue that has the potential to recur in future cases"); *State v. Bumanglag,* 63 Haw. 596, 615–16, 634 P.2d 80, 93 (1981). Accordingly, we conclude that the admission of a speed check card for which a proper foundation has been established does not violate a defendant's Sixth Amendment rights.

The confrontation clause provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[,]" U.S. Const. amend. VI, and this guarantee applies to both federal and state prosecutions, *Crawford,* 541 U.S. at 42, 124 S.Ct. 1354. In *Crawford,* the United States Supreme Court held that the confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53–54, 124 S.Ct. 1354. Although the Court in *Crawford* left open the possibility that the confrontation clause would apply to nontestimonial hearsay,[11] the Court in *Davis v. Washington,* 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), subsequently held that "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Id.* at 821, 126 S.Ct. 2266. Therefore, in order to determine whether the author of a speed check card is subject to confrontation under the Sixth

Amendment, we must determine whether the card is "testimonial." [12]

There has been no definitive statement by the Supreme Court regarding what is "testimonial" in nature. In *Crawford,* the defendant was charged with assault and attempted murder after stabbing a man who had allegedly attempted to rape his wife. 541 U.S. at 38–40, 124 S.Ct. 1354. The wife invoked the state marital privilege and refused to testify, and the trial court admitted her tape-recorded statements to the police as evidence that the stabbing was not in self-defense, offering several reasons why the statement was trustworthy. *Id.* at 40, 124 S.Ct. 1354. The Court held that the Confrontation Clause "applies to 'witnesses' against the accused-in other words, those who 'bear testimony.'" *Id.* at 51, 124 S.Ct. 1354 (citation omitted). "'Testimony,' in turn, is typically 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* (citation and internal brackets omitted). The Court further held that

> Various formulations of this core class of "testimonial" statements exist: "ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23; "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois,* 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment); "statements that were made under circumstances which would

11. In *Crawford,* the Court noted that it had rejected the proposition that "we apply the Confrontation Clause only to testimonial statements, leaving the remainder to regulation by hearsay law" in *White v. Illinois,* 502 U.S. 346, 352–53, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). 541 U.S. at 61, 124 S.Ct. 1354. The Court noted that "[a]lthough our analysis in this case casts doubt on that holding, we need not definitively resolve whether it survives our decision today, because [the statement at issue] is testimonial under any definition." *Id.*

12. Although *Ing* holds that the admission of testimony based upon a speed check card did not violate the confrontation clause, 53 Haw. at 468, 497 P.2d at 577, it was decided in 1972 and thus predated the restructuring of confrontation clause jurisprudence initiated by the Supreme Court in *Crawford.* Thus, it has limited if any precedential value, and to the extent it conflicts with the analysis here, it is overruled.

lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Brief for National Association of Criminal Defense Lawyers et al. as Amici Curiae 3. These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition-for example, ex parte testimony at a preliminary hearing.

*Id.* at 51–52, 124 S.Ct. 1354.

The Court held that the wife's statements were "testimonial under any definition," *id.* at 61, 124 S.Ct. 1354, but "le[ft] for another day any effort to spell out a comprehensive definition of 'testimonial[,]'" *id.* at 68, 124 S.Ct. 1354.

In *Davis,* the Court examined whether statements made to police in two separate cases were testimonial and therefore subject to confrontation under *Crawford.* In the first case, the trial court admitted a recording of a 911 call by a woman reporting an incident of domestic abuse as it was happening, and her responses to the operator's questions about the circumstances of the incident. 547 U.S. at 817–19, 126 S.Ct. 2266. In the second case, the trial court admitted a "battery affidavit" signed by a woman in the presence of police subsequent to an incident of alleged domestic abuse. *Id.* at 820, 126 S.Ct. 2266. The Court found that both statements were made in response to police interrogation. *Id.* at 823, 126 S.Ct. 2266. The Court compared the interrogation in the first case to that in *Crawford,* and found that "[t]he difference ... [between the two] is apparent on the face of things. In [the first case], [the woman making the 911 call] was speaking about things *as they were actually happening,* rather than describing past events," *id.* at 827, 126 S.Ct. 2266 (emphasis in original; citation and internal quotations and brackets omitted). The caller "simply was not acting as a *witness;* she was not *testifying.* What she said was not 'a weaker substitute for live testimony' at trial[.]" *Id.* at 828, 126 S.Ct. 2266 (emphasis in original; citation omitted). In contrast, the circumstances of the second interrogation constituted "an investigation into possibly criminal past conduct[,]" where the police officer was "not seeking to determine (as in [the first case]) 'what is happening,' but rather 'what happened.'" *Id.* at 829–30, 126 S.Ct. 2266. The Court again declined to define precisely what is "testimonial" in nature, holding as follows:

> Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822, 126 S.Ct. 2266.[13]

The Court recently revisited the issue of what constitutes a "testimonial" statement in *Melendez–Diaz.* There, Massachusetts police received a tip that a K-mart employee was engaging in suspicious activity. 129

---

13. In *State v. Grace,* 107 Hawai'i 133, 111 P.3d 28 (App.2005), the ICA considered what kinds of statements are "testimonial" in nature under the Sixth Amendment. In *Grace,* two girls witnessed an alleged incident of domestic violence and were interviewed by police at the scene. *Id.* at 136, 111 P.3d at 31. The ICA adopted the test promulgated by the National Association for Criminal Defense Lawyers (NACDL), identified by *Crawford* as one of "[v]arious formulations of this core class of 'testimonial' statements[,]" *see* 541 U.S. at 51–52, 124 S.Ct. 1354, and held that the girls' statements were testimonial because they were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," 107 Hawai'i at 143, 111 P.3d at 38 (citation omitted).

In light of our holding below that the speed check card is not testimonial because it was prepared in the course of regular equipment maintenance, we do not need to decide whether the ICA was correct in adopting the broader NACDL test in *Grace.*

S.Ct. at 2530. The officers set up surveillance in the K-mart parking lot, and observed the defendant repeatedly received calls at work, after which he would be picked up at the front of the store in a blue sedan and return a short time later. *Id.* The officers detained and searched the employee, finding four clear white plastic bags containing a substance resembling cocaine. *Id.* The officers then arrested the two men in the sedan, one of whom was Melendez–Diaz. *Id.* The officers then placed all three men in a police cruiser. *Id.* After noticing the three men fidgeting and making furtive gestures en route to the station, the police searched the cruiser and found a plastic bag containing 19 smaller bags hidden in the vehicle. *Id.*

Melendez–Diaz was charged with distributing and trafficking cocaine. *Id.* At trial, the prosecution introduced into evidence all of the bags seized, as well as three "certificates of analysis" showing the results of the tests performed on the seized substances by a state laboratory. *Id.* at 2531. The certificates were sworn to before a notary public by analysts at the laboratory, and stated the weight of the seized substance and that it contained cocaine. *Id.* Melendez–Diaz objected to the admission of the certificates on the grounds that *Crawford* required that the analysts testify in person. *Id.* The objection was overruled, and Melendez–Diaz was found guilty. *Id.* The Appeals Court of Massachusetts rejected his appeal, holding that pursuant to state law, the authors of certificates of forensic analysis were not subject to confrontation under the Sixth Amendment. *Id.*

The Supreme Court reversed, holding that the certificates fell within the "core class of testimonial statements" described in *Crawford. Id.* at 2532, 2542. The Court found that the certificates were "quite plainly affidavits[,]" and that the description in *Crawford* of "core" testimonial statements "mentions affidavits twice." *Id.* at 2532 (citing *White v. Illinois,* 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992)) (Thomas, J., concurring in part and concurring in judgment) ("[T]he Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions."). The Court stated that "[t]he 'certificates' are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.'" *Id.* (citing *Davis,* 547 U.S. at 830, 126 S.Ct. 2266) (emphasis omitted). Furthermore, "not only were the affidavits 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' *Crawford,* [541 U.S] at 52[, 124 S.Ct. 1354], but under Massachusetts law the *sole purpose* of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance," *id.* at 2532 (citing Mass Gen. Laws, ch. 111, § 13; emphasis in original). The court rejected the argument that the analysts were not subject to confrontation because they were not "accusatory" witnesses, holding that "they certainly provided testimony *against* petitioner, proving one fact necessary for his conviction-that the substance he possessed was cocaine." *Id.* at 2533 (emphasis in original).

In response to concerns expressed by dissenting justices, the Court noted:

Contrary to the dissent's suggestion, we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or *accuracy of the testing device,* must appear in person as part of the prosecution's case. While the dissent is correct that '[i]t is the obligation of the prosecution to establish the chain of custody,' this does not mean that everyone who laid hands on the evidence must be called.... *Additionally, documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records.*

*Id.* at 2532 n. 1 (internal citations omitted) (emphasis added).[14]

---

**14.** The Court also noted elsewhere in the opinion that "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at

Justice Thomas concurred in the judgment, and wrote separately. He reiterated the majority's citation to his concurrence in *White*, noting that "I continue to adhere to my position that 'the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.'" *Id.* at 2543 (citing *White*, 502 U.S. at 365, 112 S.Ct. 736) (Thomas, J. concurring in part and concurring in judgment). Thomas stated that he "join[ed] the Court's opinion in this case because the documents at issue in this case 'are quite plainly affidavits,' *ante*, at 2532. As such, they 'fall within the core class of testimonial statements' governed by the Confrontation Clause[.]" *Id.*

As noted above, the Court in *Melendez–Diaz* observed that "documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records." 129 S.Ct. at 2532 n. 1. The speed check card at issue here was created in a non-adversarial setting in the regular course of maintaining Ah Yat's police vehicle, five months prior to the alleged speeding incident. Accordingly, it is nontestimonial in nature. *See U.S. v. Forstell*, 656 F.Supp.2d 578, 579–82 (E.D.Va. 2009) (where the defendant was charged with speeding, driving under the influence, and driving while intoxicated, the court concluded that certificates that a speed radar device, tuning fork, and Intoxilyzer were tested for accuracy and functioning properly were nontestimonial and not subject to the Confrontation Clause under *Melendez–Diaz*); *U.S. v. Gitarts*, 341 Fed.Appx. 935, 940 n. 2 (4th Cir.2009) (unpublished disposition, citable pursuant to Federal Rules of Appellate Procedure Rule 32.1) (concluding that "*Melendez–Diaz* explicitly reaffirms *Crawford's* holding that traditional business records are not testimonial evidence").

Accordingly, Fitzwater's right to confrontation under the Sixth Amendment was not violated by the admission of the speed check evidence.

**D. The State failed to establish sufficient foundation for the reliability of the speed check**

In his opening brief at the ICA, Fitzwater argued, inter alia, that Ah Yat provided expert testimony despite not being qualified to do so, and that the State failed to establish a sufficient foundation to show that the speedometer had been properly calibrated under the principles set forth in *State v. Wallace* and *State v. Manewa*. The State responded in its answering brief that *State v. Ing* supported the admission of Ah Yat's testimony about the contents of the speed check card, and that in any event, there was sufficient evidence to support Fitzwater's conviction independent of the speed check evidence.[15]

█ In its SDO, the ICA sua sponte found that Fitzwater had failed to adequately preserve these arguments, and accordingly declined to address them. *State v. Fitzwater*, No. 28584, 120 Hawai'i 383, 205 P.3d 648, 2009 WL 1112602, at *2. However, we conclude that the ICA erred in declining to address Fitzwater's arguments. Fitzwater objected in the district court that Ah Yat's testimony was based on inadmissible hearsay and that there was insufficient foundation for the admission of the speed check card. Viewed in context, these objections were sufficient to preserve the issue of whether the speed check card satisfied the foundational requirements described in *Wallace* and *Manewa*. *See* HRE Rule 103(a)(1) (when a party disputes the admissibility of evidence, the party must timely object "stating the specific ground of objection, if the specific ground was not apparent from the context[.]"). It was apparent that Fitzwater was objecting to a lack of foundation to show that the speedometer had been properly calibrated and was therefore accurate. His objections were made in response to the State asking Ah Yat to describe the results of the speed check, essentially asking Ah Yat to testify that the results showed that the speedometer was accurate at various speeds. *See, e.g. State v. Long*, 98 Hawai'i 348, 353–355, 48 P.3d 595, 600–602 (2002) (defense counsel objected that there was "insufficient

---

trial—they are not testimonial." *Melendez–Diaz*, 129 S.Ct. at 2539–40.

**15.** We address the latter argument in section III–E below.

foundation" for an HPD criminalist's testimony that the substance which the defendant was charged with possessing was cocaine based upon her testing of the substance using the appropriate device; objection was sufficient to preserve the issue of whether or not the State established a sufficient foundation as to the accuracy of the device because "the basis for [the defendant's] foundational objection should have been obvious to the court"); *Wallace,* 80 Hawai'i at 408, 411 n. 26, 910 P.2d at 721, 724 n. 26 (defendant objected to forensic chemist's testimony regarding the net weight of the cocaine as indicated by the analytic scale, arguing "it's hearsay as to the fact that he's using a scale. We don't know if the scale is accurate . . . ."; this court recognized that although defendant's objection was made on "hearsay" grounds, given the context of his explanation for the objection, "it was 'apparent' to the circuit court that the objection was really one of lack of proper foundation"). Moreover, the district court appeared to understand the nature of Fitzwater's objections when it responded by citing to *Ing,* in which this court indicated that the officer's "testimony relative to the speed check bore indicia of reliability." 53 Haw. at 468, 497 P.2d at 577. Therefore, Fitzwater sufficiently gave the "trial court . . . an opportunity to fully understand the objection and, thus, to appropriately rule on it." *Long,* 98 Hawai'i at 352, 48 P.3d at 599 (citations omitted).

Thus, we will address the merits of Fitzwater's arguments. We conclude that the district court erred in admitting the speed check card without the necessary foundational evidence regarding the reliability of the calibration testing as required by *Wallace* and *Manewa.*

The record does not indicate exactly what kind of test was performed at Jack's Speedo Shop, although it is fair to infer that the test required some specialized training and/or expertise to perform. Officer Ah Yat did not indicate that he had any such training or expertise; instead, his testimony was quite clearly based solely on the contents of the speed check card.

In *Wallace,* we considered the admissibility of test results relating to the weight of narcotics. The State offered testimony from a Naval Investigative Service chemist concerning the results he obtained using an electronic balance to weigh cocaine. The chemist testified that the balance was calibrated annually by the manufacturer's service representative, and he "assume[d] [the representative was] qualified to service and calibrate the balance." 80 Hawai'i at 408, 910 P.2d at 721. However, we held that:

> [The chemist] lacked personal knowledge that the balance had been correctly calibrated and merely assumed that the manufacturer's service representative had done so. The service representative did not testify at trial regarding his calibration of the balance, nor did the prosecution, through a custodian of records, offer any business record of the manufacturer reflecting proper calibration of the balance. There being no reliable evidence showing that the balance was "in proper working order," the prosecution failed to lay "a sound factual foundation" that the net weight of the cocaine measured by the balance was accurate. Therefore, because inadequate foundation was laid to show that the weight measured by the balance could "be relied on as a substantive fact," [the chemist's] assumption that the balance was accurate was based on inadmissible hearsay. Accordingly, we hold that the circuit court clearly abused its discretion in admitting [the chemist's] testimony regarding the net weight of the cocaine.

*Id.* at 412, 910 P.2d at 725 (citations omitted).[16]

In *Manewa,* the State offered testimony from an HPD criminalist concerning the results he obtained using an analytical balance to weigh methamphetamine. 115 Hawai'i at

**16.** We noted in a footnote that:
> Wallace concedes in his brief that "[a] document provided by the calibrating agency showing the name of the person calibrating the [balance], that he was qualified, [and] that [the balance] was calibrated on a certain date may

> well have fallen under the hearsay exception[s] [relating to] business records, but this was not [offered into evidence]. *See* [HRE] 803(b)(6) or 803(b)(8)."

*Id.* at 412 n. 28, 910 P.2d at 725 n. 28 (citation omitted; brackets in original).

345–46, 167 P.3d at 338–39. The criminalist testified that he did not know how to calibrate or service the balance himself, although a manufacturer representative "checks out and services the balance two times a year" and fills out a form indicating that the balance is in proper working condition. *Id.* at 346, 355, 167 P.3d at 339, 348. The manufacturer's representative was not called as a witness by the State, and "[m]oreover, as in *Wallace,* [the State] did not offer any business records of the manufacturer indicating a correct calibration of the balance." *Id.* at 355, 167 P.3d at 348.

The criminalist also testified that "I have my own personal balance which I verify and validate once a month and we so record it." *Id.* at 346, 167 P.3d at 339. However, this court noted that there was "confusion" in the record regarding whether that balance was involved in weighing the samples, and further concluded that the chemist's testimony did not establish that he had followed the "manufacturer's established procedure" for calibrating the balance. *Id.* at 356–57 & n. 13, 167 P.3d at 349–50 & n. 13.

Accordingly, we held that the testimony of the criminalist regarding the weight of the substance was not properly admitted.[17]

*Wallace* and *Manewa* thus described the foundational requirements that must be met

before results of the calibration of scales used to weigh narcotics can "be relied on as a substantive fact." *Wallace,* 80 Hawai'i at 412, 910 P.2d at 725 (citations and internal quotation marks omitted). In *State v. Assaye,* 121 Hawai'i 204, 216 P.3d 1227 (2009), we recognized that similar requirements applied in the context of admitting evidence about the calibration of laser guns used to measure speed. *Id.* at 212, 216 P.3d at 1235 (characterizing the admission of evidence relating to testing of a laser gun which omitted any reference to whether the tests "were procedures recommended by the manufacturer" as "obviously inconsistent with this court's decision in *Manewa* "). Based on the record before us, we see no reason to apply different foundational requirements in the context of speed checks, since the underlying concerns about the reliability of the testing appear to be similar. To the extent that *Ing* suggests that the results of speed checks are admissible because they inherently "bore indicia of reliability" without any mention of these foundational requirements being satisfied, 53 Haw. at 468, 497 P.2d at 577, it is overruled.

■ Thus, in order for the results of speed checks to be admissible, the State must establish: (1) how and when the speed check was performed, including whether it

---

**17.** This court recently applied the reasoning of *Wallace* and *Manewa* in *State v. Assaye,* 121 Hawai'i 204, 216 P.3d 1227 (2009), in which the defendant was charged with excessive speeding in violation of HRS § 291C–105(a) after being pulled over by an HPD officer who used a laser gun to measure the defendant's speed. *Id.* at 205, 216 P.3d at 1228. At trial, the officer testified that he was certified to use the laser gun and had also been instructed how to test and operate it. *Id.* at 205–06, 216 P.3d at 1228–29. When asked about the results of the tests he had conducted on the laser gun prior to his shift, defense counsel objected as to lack of foundation. *Id.* at 206, 216 P.3d at 1229. The trial court overruled the objection and admitted the officer's testimony. *Id.* at 207, 216 P.3d at 1230.

This court held that the officer's testimony did not provide a sufficient foundation for the laser gun's speed reading to be admitted as a "substantive fact." *Id.* at 212–14, 216 P.3d at 1235–37. Specifically, this court held that the prosecution did not meet its burden of "prov[ing] that the laser gun's accuracy was tested according to procedures recommended by the manufacturer," *id.* at 215, 216 P.3d at 1238, because

[a]lthough [the officer] testified that he was "certified" to use the laser gun ... and he was "instructed in the testing and operating of the device," the prosecution does not point to anywhere in the record to indicate that the four tests that [the officer] testified to conducting were recommended procedures by the manufacturer for the purpose of showing that the laser gun was in fact operating properly on [the day the defendant was cited].

*Id.* at 213, 216 P.3d at 1236.

Furthermore, this court held that "the same burden of proof is applied to the issue of whether the officer is qualified by training and experience to operate the particular laser gun; namely, whether the nature and extent of an officer's training in the operation of a laser gun meets the requirements indicated by the manufacturer." *Id.* at 215, 216 P.3d at 1238. The prosecution failed to satisfy this burden because it failed to show whether the training the officer received met the requirements of the manufacturer of the laser gun. *Id.* at 216, 216 P.3d at 1239.

was performed in the manner specified by the manufacturer of the equipment used to perform the check, and (2) the identity and qualifications of the person performing the check, including whether that person had whatever training the manufacturer recommends in order to competently perform it. *See Assaye*, 121 Hawai'i at 212–14, 216 P.3d at 1235–37; *Wallace*, 80 Hawai'i at 412 n. 28, 910 P.2d at 725 n. 28; *Manewa*, 115 Hawai'i at 355–57, 167 P.3d at 348–50. The State may provide this information through in-court testimony or through a properly authenticated business record pursuant to HRE Rule 803(b)(6). *See Wallace*, 80 Hawai'i at 412 n. 28, 910 P.2d at 725 n. 28 (recognizing that the required foundation could be established by "[a] document provided by the calibrating agency"); *Manewa*, 115 Hawai'i at 355, 167 P.3d at 348 ("[m]oreover, as in *Wallace*, [the State] did not offer any business records of the manufacturer indicating a correct calibration of the balance"). As noted in section III–B above, HRE Rule 803(b)(6) provides that a business record may be authenticated by the testimony of either the custodian of the record or a qualified witness, or by certification in accordance with HRE Rule 902(11) or a statute permitting certification.

■ The required information was missing from the record here. It was not established by Ah Yat in his testimony. Nor was it established by the speed check card. As discussed in section III–B, the speed check card was not authenticated and was, therefore, inadmissible as a business record pursuant to HRE Rule 803(b)(6). As a result, "inadequate foundation was laid to show" that the speed check "could 'be relied on as a substantive fact[,]'" *Wallace*, 80 Hawai'i at 412, 910 P.2d at 725 (citations omit-

ted), and the district court erred in admitting the speed check evidence.[18]

## E. Absent the speed check evidence, there was insufficient evidence to support the district court's judgment

■ As noted above, the district court relied on alternate grounds in finding that Fitzwater's "speed was 70 miles an hour beyond a reasonable doubt." In addition to the speed check evidence, which we have concluded was improperly admitted, the district court held that Ah Yat's testimony that he had been operating his vehicle almost daily for over a year and observed that his speedometer seemed to be operating normally at all times provided an independent basis for concluding that Fitzwater had exceeded the speed limit by 35 miles per hour. Similarly, in its Answering Brief to the ICA, the State argued that this testimony by Ah Yat was sufficient "to establish that the speedometer of the police vehicle was accurately operational on the date of the offense . . . ."

"HRS § 701–114(1)(a) and (b) (1993) requires proof beyond a reasonable doubt of each element of the offense . . . ." *Assaye*, 121 Hawai'i at 216, 216 P.3d at 1239 (quoting *Manewa*, 115 Hawai'i at 357–58, 167 P.3d at 350–51). To prove that Fitzwater was speeding excessively in violation of HRS § 291C–105, the State must prove beyond a reasonable doubt that Fitzwater was driving at a speed exceeding the speed limit by 30 miles per hour or more. *Id.* Ah Yat testified that Fitzwater was traveling 70 miles per hour in a 35 mile per hour zone, which was 5 miles per hour greater than the threshold established by HRS § 291C–105. Other than Ah Yat's testimony that his speedometer appeared to have been operating normally

---

18. At oral argument, the State suggested that if this court concludes that there was insufficient foundation to admit the speed check evidence, this court should apply any new requirements set forth in this opinion prospectively pursuant to *State v. Ikezawa*, 75 Haw. 210, 857 P.2d 593 (1993). MP3: Oral Argument, Hawai'i Supreme Court, at 01:08 (Nov. 5, 2009), *available at* http://www.courts.state.hi.us/courts/oral_arguments/archive/oasc28584.html. We need not address this argument because it was not previously raised by the State in these proceedings, but was instead raised for the first time on appeal at oral

argument. *Zane v. Liberty Mut. Fire Ins. Co.*, 115 Hawai'i 60, 76 n. 16, 165 P.3d 961, 977 n. 16 (2007); *Hana Ranch, Inc. v. Kaholo*, 2 Haw.App. 329, 332, 632 P.2d 293, 295 (1981). In any event, "the question of prospective application [only] arises when this court announces a new rule." *State v. Jess*, 117 Hawai'i 381, 400, 184 P.3d 133, 152 (2008); *see Ikezawa*, 75 Haw. at 220, 857 P.2d at 597 ("judicial decisions are assumed to apply retroactively"). We are not announcing a new rule in this case, but are instead applying the established precedent of *Manewa* and *Wallace*.

throughout the previous year, there was no other admissible evidence to establish that Ah Yat's speedometer was accurate and in proper working order. Thus, we must decide whether Ah Yat's testimony alone was sufficient to establish beyond a reasonable doubt that the speedometer on his police vehicle was accurate to within 5 miles per hour on the night of the offense. We conclude that it was not, given the relatively small margin of error of 5 miles per hour.[19]

■■■ Accordingly, there was insufficient evidence in the record to sustain Fitzwater's conviction under HRS § 291C–105, and the conviction must be vacated. *Cf. Assaye,* 121 Hawai'i at 216, 216 P.3d at 1239. However, there was sufficient evidence to establish that Fitzwater was driving his vehicle "at a speed greater than the maximum speed limit" in violation of HRS § 291C–102(a)(1), based on Fitzwater's admission during his testimony that he was driving in excess of the speed limit, as well as Ah Yat's testimony. *See State v. Simpson,* 64 Haw. 363, 370, 641 P.2d 320, 325 (1982) ("Under the 'waiver doctrine' appellate courts will review the sufficiency of the evidence in light of all the evidence presented in the record."); *State v. Pudiquet,* 82 Hawai'i 419, 423–425, 922 P.2d 1032, 1036–1038 (App.1996) (considering the entire record, including the defendant's testimony, in assessing the sufficiency of the evidence); *State v. Gomes,* 117 Hawai'i 218, 224, 177 P.3d 928, 934 (2008) (concluding that because the defendant "put on evidence after moving for a judgment of acquittal at the end of [the State's] case, he waived any error in the denial" of this motion). Accordingly, we remand for entry of a judgment that Fitzwater violated HRS § 291C–102(a)(1), in accordance with the applicable statutes governing non-criminal traffic infractions. *Cf. State v. Line,* 121 Hawai'i 74, 90, 214 P.3d 613, 629 (2009) ("It is established that 'if an appellate

court determines that the evidence presented at trial was insufficient to support a conviction of a greater offense but sufficient to support a conviction of a lesser included offense, the court may remand for entry of judgment of conviction on the lesser included offense[.]' ") (citation omitted).

## IV. CONCLUSION

Accordingly, we conclude that the speed check evidence should not have been admitted under HRE Rule 803(b)(6), and that, absent that evidence, there was insufficient evidence to support Fitzwater's conviction for excessive speeding. We therefore vacate the May 12, 2009 judgment of the Intermediate Court of Appeals, and the May 9, 2007 judgment of the District Court of the First Circuit, and remand for further proceedings consistent with this opinion.

Concurring and Dissenting Opinion by ACOBA, J.

I concur in the result only, inasmuch as in this case there was an absolute failure of proof as to what test was employed to assess the accuracy of the speedometer and as to the reliability of that test, both fundamental tenets of scientific evidence. Because such failure of proof is determinative, in my view it is unwise to decide issues beyond that determination, as the majority does; rather we should await cases in which such issues must actually be decided.

Petitioner/Defendant–Appellant Zachariah I. Fitzwater (Petitioner) was convicted of excessive speeding in violation of Hawai'i Revised Statutes (HRS) § 291–105(a)(1) (2007 Repl.).[1] At Petitioner's trial, the District Court of the First Circuit (the court) allowed the Honolulu Police Department (the HPD or HPD) Police Officer Neil Ah Yat to testify

---

**19.** At oral argument, the State represented that speed checks have shown that speedometers are typically accurate to within "a couple miles per hour." *See* MP3: Oral Argument, Hawai'i Supreme Court, at 01:02 to 01:03 (Nov. 5, 2009), *available at* http://www.courts.state.hi.us/courts/oral_arguments/archive/oasc28584.html. However, defense counsel represented that there have been cases in which speedometers were shown to be inaccurate by as much as 8 miles per hour.

*See id.* at 01:10 to 01:11. These representations are not part of the record, and the record itself is silent with regard to the general accuracy of speedometers in police vehicles.

**1.** HRS § 291C–105 states in relevant part:
 **Excessive speeding.** (a) No person shall drive a motor vehicle at a speed exceeding:
 (1) The applicable state or county speed limit by thirty miles per hour or more;

that his speedometer was accurate on the day that Petitioner was cited. A "speed check card,"[2] which purported to verify the accuracy of the speedometer in the officer's vehicle, was admitted into evidence by the court over Petitioner's objection. The Intermediate Court of Appeals (ICA) affirmed Petitioner's conviction. *State v. Fitzwater*, No. 28584, 120 Hawai'i 383, 205 P.3d 648, 2009 WL 1112602, at *2 (Haw.App. Apr. 27, 2009) (SDO). The four questions raised in Petitioner's Application for Writ of Certiorari are whether the ICA gravely erred in (1) holding that Respondent/Plaintiff–Appellee State of Hawai'i (Respondent) adduced sufficient foundation to admit the speed check card as a business record; (2) holding that the speed check card qualified as a business record; (3) holding that the admission of the speed check card was not a violation of Petitioner's right to confrontation under either the Hawai'i or United States Constitutions, and (4) failing to address, as a matter of plain error, that Officer Ah Yat's testimony constituted improper expert testimony.

The crux of this case, essentially posed in the first question, is whether a proper foundation was laid for the admission of the speed check card into evidence. The speed check card was patently inadmissible because (1) there is no evidence in this case of what test was administered to determine the accuracy of Officer Ah Yat's speedometer, and (2) there is no evidence of the reliability of that test. " '[A] fundamental evidentiary rule is that before the result of a test made out of court may be introduced into evidence, *a foundation must be laid showing that the test result can be relied on as a substantive fact.' " State v. Long*, 98 Hawai'i 348, 354, 48 P.3d 595, 601 (2002) (emphasis in original) (quoting *State v. Kemper*, 80 Hawai'i 102, 105, 905 P.2d 77, 80 (App.1995) (citation and internal quotation marks omitted)). In the absence of such evidence the ICA gravely erred in holding that a proper foundation was laid. Consequently, a discussion of the other questions undertaken by the majority is extraneous and advisory. Therefore, I concur only in the result reached by the majority.

## I.

It is axiomatic that "[i]n Hawai'i, the admissibility of scientific or technical evidence is governed by Hawai'i Rules of Evidence (HRE) Rules 702 (1993) and 703 (1993)." *State v. Werle*, 121 Hawai'i 274, 282, 218 P.3d 762, 770 (2009). Hence, "a proper foundation for the introduction of a scientific [or technical] test result would necessarily include expert testimony regarding: (1) the qualifications of the expert; (2) whether the expert employed valid techniques to obtain the test result; and (3) whether the measuring instrument is 'in proper working order.' " *State v. Manewa*, 115 Hawai'i 343, 350, 167 P.3d 336, 343 (2007) (quoting *Long*, 98 Hawai'i at 355, 48 P.3d at 601 (internal quotation marks and citation omitted)).

"[T]o be admissible, *'expert testimony must be both relevant and reliable.' " Long*, 98 Hawai'i at 354, 48 P.3d at 601 (quoting *State v. Maelega*, 80 Hawai'i 172, 181, 907 P.2d 758, 767 (1995)). According to the ma-

---

**2.** The speed check card contained printed and handwritten text. The speed check card, with the handwritten portions indicated in quotes, read:

JACK'S SPEEDO SHOP
Honolulu, Hawai'i, "8–9–06"

"Exp. 8–9–07"

To Whom It May Concern:
 THIS IS TO CERTIFY THAT THE
Speedometer of "Ford" No. "HPD 1040"

Was tested and found to be registering 25 Miles at 25 M.P.H.

35 Miles at 35 M.P.H. 45 Miles at 45 M.P.H.

55 Miles at 55 M.P.H. 65 Miles at 65 M.P.H.

75 " " 75 "

Correction (illegible) [Signature]

jority, Officer Ah Yat, the only witness for Respondent, "did not testify about how the checks [of the speedometer] are done." Majority opinion at 358, 227 P.3d at 524. Consequently, there is no evidence of how the "speed check" was conducted. It follows that no attempt could be made to qualify Officer Ah Yat as an expert on the test administered on his speedometer.

Additionally, "[t]he reliability requirement refers to *evidentiary* reliability—that is trustworthiness. Under this prong, admission of expert evidence is premised on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his or her discipline." *State v. Vliet*, 95 Hawai'i 94, 106, 19 P.3d 42, 54 (2001) (citations, brackets, and internal quotation marks omitted) (emphasis in original). No attempt was made by Respondent to establish, through Officer Ah Yat, that the speed test was based on *"the proper application of valid techniques grounded in valid underlying principles." Long*, 98 Hawai'i at 355, 48 P.3d at 602 (emphasis in original) (quoting *State v. Montalbo*, 73 Haw. 130, 136, 828 P.2d 1274, 1279 (1992)). Consequently, there is no evidence of the reliability of the test administered on the speedometer. Officer Ah Yat's testimony, then, was *neither* relevant nor reliable in establishing that the test result reflected on the speed card could be relied on as substantive fact.

Inasmuch as no evidence was introduced regarding the testing device, the further " 'foundational prerequisite ... [establishing] that the measuring instrument [was] in proper working order[ ]' " was not laid. *Manewa*, 115 Hawai'i at 350, 167 P.3d at 343 (quoting *State v. Wallace*, 80 Hawai'i 382, 407, 910 P.2d 695, 720 (1996) (internal quotation marks and citation omitted)). Whether the testing instrument was working properly may be established by the testimony of a person or through business records. *Manewa*, 115 Hawai'i at 355, 167 P.3d at 348 (indicating that prosecution could have "call[ed] the manufacturer's service representative to testify to calibration of the balance[,]" or "offer any business records of the manufacturer indicating a correct calibration of the balance"); *Wallace*, 80 Hawai'i at 412,

910 P.2d at 725 (indicating that the prosecution could have presented "reliable evidence showing that the balance was 'in proper working order' " (citation omitted), through the testimony of the service representative for the balance "regarding his calibration of the balance" or "through a custodian of records, offer[ing] any business record of the manufacturer reflecting proper calibration of the balance").

Correlatively, there was no evidence that the device assumably used to test the speedometer was properly maintained, serviced, or calibrated. *See State v. Assaye*, 121 Hawai'i 204, 216 P.3d 1227, 1235 (2009) (holding that prosecution was required to prove that the tests conducted by a police officer on a laser gun to see if it was in proper working order "were procedures recommended by the manufacturer for the purpose of showing that the particular laser gun was in fact operating properly"); *Manewa*, 115 Hawai'i at 357, 167 P.3d at 350 (holding that proper foundation for weight of drugs was not established because prosecution "failed to produce evidence of any manufacturer's established procedure for such validation and verification" that scale used for measuring drugs was properly calibrated); *Wallace*, 80 Hawai'i at 412, 910 P.2d at 725 (holding that the failure of the prosecution to offer "through a custodian of records ... any business record of the manufacturer reflecting proper calibration" of a scale used to weigh drugs meant that testimony of net weight of drugs was inadmissible because proper foundation of accuracy of the scale was not established). Because Officer Ah Yat did not conduct the test, he could not testify as to such matters. As a result, the evidence did not establish

> [ (1) ] that [whoever conducted the test] had any training or expertise in calibrating the [testing device], (2) that the [testing device] had been properly calibrated by the manufacturer's service representatives, (3) that there was an accepted manufacturer's established procedure for "verifying and validating" that the [testing device] was in proper working order and that if such a procedure existed, that [the operator] followed it, and (4) that [the testing device] was in proper working order at the time the [speedometer] was [checked].

*Manewa,* 115 Hawaiʻi at 354, 167 P.3d at 347 (brackets omitted). Obviously, then, there was no evidence that the speed check device "ha[d] been inspected and serviced as required by the manufacturer." *Assaye,* 121 Hawaiʻi at 217, 216 P.3d at 1240 (Acoba, J., concurring). Hence, the speed card result was inadmissible in evidence,[3] and the court should have granted Petitioner's motion for judgment of acquittal as to the HRS § 291C–105 excessive speeding charge.[4]

## II.

Thus I cannot agree with the need for the discussion undertaken by the majority beyond the proposition that there was an absolute failure of proof by Respondent. Such a discussion is advisory and, thus, without the benefit of a concrete controversy to validate our opinion. *See Kapuwai v. City & County of Honolulu,* 121 Hawaiʻi 33, 41, 211 P.3d 750, 758 (2009) (concluding that "the ICA's issuance of an advisory opinion on an unripe issue implicates concerns about the proper—and properly limited—role of courts in a democratic society and contravenes the prudential rules of judicial self-governance") (internal quotation marks and citation omitted); *Trustees of Office of Hawaiian Affairs v. Yamasaki,* 69 Haw. 154, 171, 737 P.2d 446, 456 (1987) ("When confronted with an abstract or hypothetical question, we have addressed the problem in terms of a prohibition against rendering 'advisory opinions[.]' ") (Citation omitted); *State v. Fields,* 67 Haw. 268, 274, 686 P.2d 1379, 1385 (1984) (recognizing that "the prudential rules of judicial self-governance founded in concern about the proper—and properly limited—role of courts in a democratic society are always of relevant concern" and "even in the absence of constitutional restrictions, courts must still careful-

ly weigh the wisdom, efficacy, and timeliness of an exercise of their power before acting") (internal quotation marks, footnote, and citation omitted).

The majority argues "the need to provide guidance on this issue in order to prevent 'serious judicial mistakes' in the future[.]" Majority opinion at 370, 227 P.3d at 536 (quoting *Kapuwai,* 121 Hawaiʻi at 42, 211 P.3d at 759 (quoting *Fields,* 67 Haw. at 276, 686 P.2d at 1386)). This, however is an incomplete quotation from *Kapuwai* and *Fields.* The complete quote states, additionally, "in situations where resort to appeal may be otherwise foreclosed." *Kapuwai,* 121 Hawaiʻi at 42, 211 P.3d at 759; *Fields,* 67 Haw. at 276, 686 P.2d at 1386. In fact, in *Kapuwai,* the plurality opinion rejected the invitation to provide guidance, holding that that portion of the ICA's opinion concerning "attorney's fees and costs was not ripe for decision and *constitute[d] an advisory opinion akin to the issuance of an opinion where there is no subject matter jurisdiction.*" 121 Hawaiʻi at 43, 211 P.3d at 760 (Moon, C.J., announcing the decision of the court) (citation omitted) (emphasis added). In *Fields,* a probation condition authorizing warrantless searches of probationers threatened the constitutional right against the invasion of privacy and was "neither mandated nor expressly sanctioned by ... statutory provisions." 67 Haw. at 276, 686 P.2d at 1386. This court, exercising its power of "general superintendence" over inferior courts, *id.* (citing HRS § 602–4), concluded that it was appropriate "to act before there [was] an attempt to enforce the sentencing court's order, since [its] bounden duty include[d] the prevention of serious judicial mistakes *in situations where resort to appeal may be otherwise foreclosed[,]* " *id.* (emphasis added).

---

**3.** I agree with the majority that *State v. Ing,* 53 Haw. 466, 497 P.2d 575 (1972), "does not specifically address many of the foundational requirements required for admission of a document under HRE Rule 803(b)(6)" as discussed above. Majority opinion at 370, 227 P.3d at 536. In light of more recent authority cited *supra,* I concur with the majority that *Ing* has "limited precedential value in this context, and to the extent [that] it conflicts with the analysis set forth here, it is overruled." *Id.* at 370, 227 P.3d at 536.

**4.** I agree that there was sufficient evidence to support entry of judgment against Petitioner on the infraction of speeding in violation of HRS § 291C–102(a)(1). During trial, Petitioner admitted "going maybe 50 miles an hour or something like that" when the speed limit changed from 45 to 35 miles an hour. Therefore, there was sufficient evidence based on his testimony to establish that Petitioner was driving his vehicle "at a speed greater than the maximum speed limit" in violation of HRS § 291C–102(a)(1).

Clearly, this case does not present the situation discussed by the plurality opinion in *Kapuwai* and in *Fields* "where resort to appeal may be otherwise foreclosed." 67 Haw. at 276, 686 P.2d at 1386. Here, the admissibility of the speed check card is not unripe for discussion and in contesting that admissibility, Petitioner has not been foreclosed from bringing an appeal. As such, the "prevent[ion] of judicial mistakes where resort to appeal may otherwise be foreclosed" is simply not applicable here.

Accordingly, we should await those cases that are premised on facts for which our ruling will have a real consequence. For example, in oral argument, Respondent admits that "there was not very detailed testimony as to what the [speed check] tests composed of and what [the person who conducted the tests] did." MP3: Oral Argument, Hawai'i Supreme Court, at 0:41:31 (Nov. 5, 2009), *available at* http://www.courts.state.hi.us/courts/oral_arguments/archives/oasc 28584.html. Respondent considered this "unfortunate" because at the time of oral argument, there was another "test case" currently on appeal "before the ICA" in which "[the person who conducted the tests] actually came in [to trial] and gave live testimony to what he did." *Id.* at 0:41:44 to 41:53. Hence, we should decide requirements of admissibility and constitutional implications where they directly bear on the merits.

### III.

However, inasmuch as the majority's further exposition can be viewed as determinative of questions that may arise in future cases, it is necessary to address them. In my view, the second question and fourth question regarding whether the speed check card qualified as a business record and whether Officer Ah Yat was a qualified expert witness should not be reached because, as noted *supra*, there was no foundation for the speed check evidence. Nevertheless, inasmuch as the majority discusses the "business record" exception to the hearsay rule, I believe the following analysis applies.

At trial, over the objection of Petitioner, the court admitted the speed check card into evidence as a record of regularly conducted activity of the HPD. Officer Ah Yat testified that "[a] speed check is verification which is taken care of by the [HPD's] vehicle maintenance section [ (VMS) ]" and that "[VMS] take[s] the vehicle to the shop to calibrate the actual speed of the car with the speedometer." The speed check card associated with the officer's vehicle was not a record originating with the HPD, but was seemingly created at "Jack's Speedo [Shop (Jack's) ]." Officer Ah Yat testified that he did not know when the HPD "received the speed-check card," but apparently the speed check card was made part of the HPD's records and "it stay[ed] with the vehicle[.]" Thus, the speed check card, which originated at Jack's and became part of the HPD record, constitutes multiple hearsay.

There can be multiple levels of hearsay contained in a business record; and each of those levels must have a basis for being admissible. *State v. Zukevich,* 84 Hawai'i 203, 205–06, 932 P.2d 340, 342–43 (1997); *Warshaw v. Rockresorts,* 57 Haw. 645, 650, 562 P.2d 428, 433 (1977). "According to HRE Rule 805 [ (1993) ], however, '[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in the[ ] rules.'" *Zukevich,* 84 Hawai'i at 206, 932 P.2d at 343. Furthermore, "multiple hearsay creates a multi-level requirement[,]" and only "if each level of hearsay independently meets the requirements for admissibility under an applicable hearsay exception, [is] the circumstantial guarantee of trustworthiness for such a statement [ ] as great as for single-level hearsay." Commentary to HRE Rule 805 (1993). In that regard, the "record," *i.e.,* the speed check card, must satisfy the regularly conducted activity exception to the, hearsay rule first, at Jack's, and second, at the HPD. With respect to each organization, then, the "records of regularly conducted activity" exception to the hearsay rule, HRE Rule 803(b)(6) (Supp.2007) controls:

> Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, *made in the*

*course of a regularly conducted activity,* at or near the time of the acts, events, conditions, opinions, or diagnoses, *as shown by the testimony of the custodian or other qualified witness,* or by certification that complies with rule 902(11) or a statute permitting certification, *unless the sources of information or other circumstances indicate lack of trustworthiness.*

(Emphases added.)

Under HRE Rule 803(b)(6) or its federal counterpart, Federal Rules of Evidence (FRE) Rule 803(6),[5] a qualified witness "need not have personal knowledge regarding the creation of the document offered, or personally participate in its creation, or even know who actually recorded the information." *Resolution Trust Corp. v. Eason,* 17 F.3d 1126, 1132 (8th Cir.1994) (quoting *United States v. Franks,* 939 F.2d 600, 602 (8th Cir.1991)). A qualified witness must, however "be familiar with the record-keeping procedures of the organization." *United States v. Baker,* 458 F.3d 513, 518 (6th Cir.2006) (" 'To be an "other qualified witness," it is not necessary that the person laying the foundation for the introduction of the business record have personal knowledge of their preparation.... All that is required of the witness is that he or she be familiar with the record-keeping procedures of the organization.' " (Quoting *Dyno Constr. Co. v. McWane, Inc.,* 198 F.3d 567, 575–76 (6th Cir.1999).)). *See also United States v. Box,* 50 F.3d 345, 356 (5th Cir.1995) ("*A qualified witness is one who can explain the system of record keeping and vouch that the require-*

*ments of Rule 803(6) are met;* the witness need not have personal knowledge of the record keeping practice or the circumstances under which the objected to records were kept.") (Emphasis added.) (Citation omitted.); *United States v. Iredia,* 866 F.2d 114, 120 (5th Cir.1989) ("A qualified witness is one who can *explain the record keeping system of the organization* and *vouch that the requirement of [FRE] 803(6) are met.*" (Emphasis added.)) (Citation omitted.); 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 803(6)[02], at 803–178 (1984) ("The phrase 'other qualified witness' should be given the broadest interpretation; he need not be an employee of the entity so long as he understands the system.") (Footnote omitted.)

**A.**

As to the first level of hearsay, that is, whether the speed check card is a record of a regularly conducted activity of Jack's, there is no evidence that the speed card information was "made in the course of [Jack's] regularly conducted activity," or testimony by Jack's custodian, "or other qualified witness" that the speed check card was made as part of the regularly conducted activity of Jack's. HRE Rule 803(b)(6). Office Ah Yat was not a qualified witness of Jack's because he was not sufficiently "familiar with the record-keeping procedures of [that] organization." *Baker,* 458 F.3d at 518. Other than Officer Ah Yat's conclusory statement that "someone takes accurate records[,]" there is

---

5. HRE Rule 803(b)(6) is similar to FRE Rule 803(6), with some variations that are not material here. The commentary to HRE Rule 803 states, in pertinent part:

[HRE Rule 803(b)(6) is] based upon Fed. R.Evid. 803(6) ... and a prior statute, [HRS § ]622–5 (1976) (repealed 1980) (originally enacted as L 1941, c 218, 1, 2, 3; am L 1972, c 104, 2(e)). However, [ ] the federal rule[ ] and the prior Hawaii statute limited admissibility to records of regularly conducted business activities, while the present rule has no such limitation. On the other hand, both the federal rule and the prior statute defined "business" very broadly as including businesses, professions, occupations, and even nonprofit institutions. See, e.g., *State v. Torres,* 60 H. 271, 589 P.2d 83 (1978) (hospital business). The modification is therefore not a substantial one. In

any event, the hallmark of reliability in this area is not the nature of the business or activity but rather *its "regularity and continuity which produce habits of precision, [the] actual experience of business in relying upon [the records], [and the] duty to make an accurate record as part of a continuing job or occupation."* [FRE] 803(6), Advisory Committee's Note. *A further safeguard is that preliminary determination of the trustworthiness of such records is discretionary with the court.*

(Emphases added.) Cases interpreting provisions of the Federal Rules of Evidence are not binding on this court; however, this court may refer to them for persuasive authority in interpreting similar provisions of the Hawai'i Rules of Evidence. *State v. Jhun,* 83 Hawai'i 472, 478, 927 P.2d 1355, 1361 (1996).

no evidence of how the test was conducted, or who at Jack's recorded the information on the card. Furthermore, there is no evidence that whoever made the entry at Jack's was under any duty to test the speedometer and accurately record the result. In the absence of such evidence, the speed card is not admissible under HRE Rule 803(b)(6).

## B.

As to the second level of hearsay, Respondent must prove that the speed check card was a record of a regularly conducted activity of the HPD. HRE 803(b)(6), stated *supra*, requires foundational evidence that the record be "made in the course of regularly conducted activity," "at or near the time of the act[,]" as "shown by the testimony of the custodian or other qualified witness."

### 1.

As stated before, a qualified witness "need not have personal knowledge regarding the creation of the document offered, or personally participate in its creation, or even know who actually recorded the information." *Resolution Trust Corp.*, 17 F.3d at 1132. However, the witness must "be familiar with the record-keeping procedures of the organization[,]" *Baker*, 458 F.3d at 518, "understand the system," Weinstein & Berger, *supra*, ¶ 803(6)[02], at 803–178 (footnote omitted), and "explain the system of record keeping and vouch that the requirements of [the business exception] are met," *Box*, 50 F.3d at 356; *accord Iredia*, 866 F.2d at 120.

The majority asserts that "Ah Yat's testimony was sufficient to satisfy several of the requirements of HRE Rule 803(b)(6) in order to admit the card as a business record of [the] HPD." [6] Majority opinion at 368, 227 P.3d at 534. However, Officer Ah Yat's testi-

mony did not establish that he was a "custodian or other qualified witness." Both the majority and the ICA acknowledged that "Ah Yat's testimony was not a 'model of clarity.'" *Id.* (quoting *Fitzwater*, No. 28584, 2009 WL 1112602, at *1). Officer Ah Yat's testimony indicates that he was unfamiliar with HPD's record-keeping procedure for speed check cards because he had no knowledge of (1) whether it was VMS or Jack's who actually performed the test, (2) whether it was VMS or Jack's who normally recorded the results, (3) when the test was recorded, or (4) the methodology used to conduct the checks.

In its opinion, the majority maintains that from "the *most plausible* interpretation of [Officer Ah Yat's] testimony," it had to "*assume* for purposes of argument" that "someone at [Jack's], which is apparently a private shop, performed a test, created the card to document the results of that test, and then gave that record to someone from HPD's VMS." Majority opinion at 368, 227 P.3d at 534 (emphases added). The majority concedes that "Ah Yat's testimony leaves open the possibility that someone from HPD's VMS actually performed the test using equipment located at [Jack's], and/or documented the results of the test[.]" *Id.* at 368, 227 P.3d at 534 n. 8. The very fact that the majority had to "*assume* for purposes of argument" (emphasis added) that the speed tests were conducted and its records created and kept in a particular way, is an obvious indication that Officer Ah Yat's testimony did not sufficiently "explain the record keeping system of the organization." *Iredia*, 866 F.2d at 120; *accord Box*, 50 F.3d at 356.

Thus, the testimony of Officer Ah Yat did not demonstrate that he was "familiar with the record-keeping procedures of the organi-

**6.** First, the majority asserts that "the speed check card is a 'record' documenting the 'act[ ]' or 'event[ ]' of calibrating Ah Yat's vehicle's speedometer." Majority opinion at 368, 227 P.3d at 534 (quoting HRE Rule 803(b)(6)). Second, the majority asserts that "there is sufficient evidence that the card was created 'at or near the time' of the speed check" because Officer Ah Yat "testified that the check was 'good' for a year," that "it was performed in August 2006[,]" and that "[t]he card [ ] contain[ed a] handwritten

notation '8–9–06,' beneath which was written 'Exp. 8–9–07'." *Id.* at 368, 227 P.3d at 534. Third, the majority asserts that with regard to whether the speed check card was "'made in the course of a regularly conducted activity[,]'" (quoting HRE Rule 803(b)(6)), "the State established that HPD incorporated the speed check card into its records and relied on it," majority opinion at 369, 227 P.3d at 535, but "did not [ ] establish that there were other indicia of reliability[,]" *id.* at 369, 227 P.3d at 535.

zation[,]" *Baker*, 458 F.3d at 518, "underst[ood] the system[,]" Weinstein & Berger, *supra*, ¶ 803(6)[02], at 803–178 (footnote omitted), or that he could "explain the record keeping system of the organization[,]" *Iredia*, 866 F.2d at 120; *accord Box*, 50 F.3d at 357. In light of the inadequacy of Officer Ah Yat's testimony, Respondent failed to prove that Officer Ah Yat was a "qualified witness" who could "explain the system of record keeping and vouch that the requirements· of Rule 803(6) are met." *Box*, 50 F.3d at 356; *accord Iredia*, 866 F.2d at 120. Therefore, Officer Ah Yat was not qualified to testify that the speed check card was a record of a regularly conducted activity of the HPD in this case.

2.

As to proof that the speed check card was made in the course of a regularly conducted activity of the police department, HRE Rule 803(b)(6) does allow records prepared by one entity to be introduced as business records of another entity but only in some circumstances. However, the "mere possession or 'custody' of records" of another is not sufficient to "qualify employees of the possessing party to lay the requisite foundation." 2 Kenneth S. Broun, et al., *McCormick on Evidence* § 292 (6th ed.2006). *See Belber v. Lipson*, 905 F.2d 549, 552 (1st Cir.1990)

(holding that records were inadmissible as a business record of Dr. Conway because "the mere custody by [Dr.] Conway of the medical records of another doctor d[id] not incorporate them into [Dr.] Conway's business records."); *Zundel v. Bommarito*, 778 S.W.2d 954, 958 (Mo.App.1989) (determining that records produced by another and received and held by the bank did not render them business records of the bank). Additionally, mere reliance upon the record is also not enough to qualify employees of the possessing party to lay the requisite foundation. *McCormick on Evidence* § 292 (citing *State v. Radley*, 804 A.2d 1127, 1132 (Me.2002) (stating that to permit admission of records of one company through the testimony of a witness employed by an entirely different organization "simply because her employer relied on [the other] organization's records in its own business dealing, is wholly unsupported by rule or law")).

The preferable approach is to allow the possessing party of documents prepared by another to introduce the documents as its own business records, provided that the "other requirements of [FRE] Rule 803(6) are met and the circumstances indicate the records are trustworthy." *United States v. Childs*, 5 F.3d 1328, 1333 (9th Cir.1993).[7]

7. The majority cites *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338 (Fed.Cir.1999), as a test that the United States Court of Appeals for the Federal Circuit uses to determine "whether a document created by one business and incorporated into the records of another can be admitted as a business record of the incorporating business." Majority opinion at 367, 227 P.3d at 533. According to the majority, the Federal Circuit in *Air Land* "surveyed cases from other circuits, and concluded that when an organization incorporates records of another entity into its own records, those records are admissible when the incorporating entity 'relied upon those records in its day-to-day operations, and where there are other strong indicia of reliability.'" *Id.* at 367, 227 P.3d at 533 (quoting 172 F.3d at 1344).

However, the majority agrees that the test set forth in *Air Land* is wanting inasmuch as *Air Land* allows hearsay statements made by third parties to be admitted under HRE 803(b)(6) as long as they are "incorporated" into another's business records and that person relied on the incorporation, even though those third party statements contain none of the requirements for admission set forth in HRE 803(b)(6). *See* ma-

jority opinion at 367, 227 P.3d at 533("*Air Land* did not specifically indicate ... whether the other foundational requirements outlined by the rule must also be satisfied.").

As set forth in the analysis above, in order for the possessing party of documents prepared by another to introduce the documents as its own business records, the other requirements of HRE Rule 803(b)(6) must be met and the circumstances must indicate that the records are trustworthy. This case is factually distinguishable from *Air Land*. In that case, the appellants, various carriers who transported household goods for military service members, appealed the district court's admission of third party estimates of goods lost or damaged during the shipping. 172 F.3d at 1340. In holding that the district court properly admitted these third party reports as business records of the military, *Air Land* noted that (1) the "repair estimates at issue were clearly relied upon by the military during the claims adjudication process[,]" *id.* at 1343, (2) "[m]ilitary service members could be fined and/or imprisoned for submitting a false claim[,]" *id.*, and (3) "the Military Claims Office personnel were responsible for becoming familiar with the com-

For example, the custodian company can make "an independent check of the records" or "can establish accuracy by other means." *Id. See, e.g., Phoenix Assocs., III v. Stone*, 60 F.3d 95, 101 (2d Cir.1995) (determining that if a witness "can supply a sufficient foundation[,]" then the "source of employment is irrelevant," and concluding that a wire transfer was admissible as a business record where the partnership's accountant was "sufficiently familiar with the business practice" to establish that the records were made as part of that practice); *Munoz v. Strahm Farms, Inc.*, 69 F.3d 501, 504 (Fed.Cir.1995) (concluding that the district court did not abuse its discretion in admitting into evidence slides dated by Kodak as business records of photographer where photographer testified that it was regular practice for him to send film to Kodak for processing and to check the dates on the slides after receiving them from Kodak); *Childs*, 5 F.3d at 1333–34 (admitting automotive records from Department of Motor Vehicles as business records of a car dealership where the car dealership confirmed the accuracy of the results by using it to keep track of their inventory).

In this case, the HPD has not established that it had conducted an "independent check" of Jack's records or established their accuracy by other means when it incorporated Jack's records into its own business records. As discussed in Part III.A. *supra*, Officer Ah Yat was not "sufficiently familiar" with the business practices of Jack's, and Officer Ah Yat's testimony did not establish that the records were made as part of Jack's business practice. *Phoenix Assocs.*, 60 F.3d at 101. In the absence of evidence of an independent check or of accuracy established by other means, the speed check card was not admissible "as a record of regularly conducted activity" of the HPD under HRE Rule 803(b)(6).

### C.

The majority opinion contains an extended discussion suggesting that "the existence of a contractual relationship between HPD and Jack's for the performance and documentation of the tests *would be* a significant factor in establishing the necessary indicia of trustworthiness" in order for Respondents to establish sufficient foundation for the admission of the speed check card under HRE 803(b)(6). Majority opinion at 369, 227 P.3d at 535–36 (emphasis added). This discussion is superfluous, as neither Petitioner nor Respondent has raised this issue. Nor does any factual basis exist in the record for application of a contractual relationship in this case.

The majority's analysis here constitutes an advisory opinion to the prosecution on how future cases such as these should be tried. *See, e.g., State v. Domingues*, 106 Hawai'i 480, 499, 107 P.3d 409, 428 (2005) (Acoba, J., dissenting, joined by Nakayama, J.) (stating that because "the proposition advanced by the majority was not argued or briefed by the parties[ ] or decided by the court[,]" and "[n]o factual basis exists in the record ... [, t]he majority's holding ... constitutes an advisory opinion to one side on how future cases under the new statute may be saved from motions for dismissal"). I respectfully cannot agree with such an approach.

### D.

Respondent has failed to establish that the speed check card satisfied the regularly conducted activity exception to the hearsay rule on both levels—first, as a regularly conducted activity of Jack's, and second, as a regularly conducted activity of the HPD. In light of these facts, I would hold that the speed check card could not be properly offered into evidence because Officer Ah Yat was not a qualified witness and his testimony was not sufficient to establish that the speed check

---

petency of estimators in the local area and with the estimating process in general," *id.* at 1344.

Unlike the military service members who could be fined or imprisoned if they submitted false claims to the Military Claims Office, in the instant case, there is no evidence of an adverse consequence if Jack's conducted its testing improperly. There is no fine or punishment if

Jack's tests are inaccurate. Second, unlike *Air Land*, the government in this case has not established that police personnel were responsible for becoming "familiar with the competency of [the companies conducting the tests]." Nor did the government establish that the police were responsible for becoming familiar with the speed check test in general.

card was a record of a regularly conducted activity under HRE Rule 803(b)(6).

## IV.

Although the majority decides that the speed check evidence *was inadmissible,* it nevertheless goes on to decide the confrontation issue posed as the third question as if the speed check evidence *was admissible,* thereby deciding an issue no longer properly before this court and rendering an advisory opinion. *See Kapuwai,* 121 Hawai'i at 41, 211 P.3d at 758, *Yamasaki,* 69 Haw. at 171, 737 P.2d at 456, *Fields,* 67 Haw. at 274, 686 P.2d at 1385.

The majority concludes that "[Petitioner's] right to confrontation under the Sixth Amendment was not violated by the admission of the speed check evidence[,]" majority opinion at 374, 227 P.3d at 540, because the speed check card is a "document[ ] prepared in the regular course of equipment maintenance," *id.* at 374, 227 P.3d at 540 (quoting *Melendez–Diaz v. Massachusetts,* 557 U.S. ——, —— n. 1, 129 S.Ct. 2527, 2532 n. 1, 174 L.Ed.2d 314 (2009)), and "[a]ccordingly [ ] is nontestimonial in nature[,]" *id.* I respectfully disagree for two reasons. First, Hawai'i case law controls and this case, on its facts, does not implicate the confrontation clauses of the United States or Hawai'i constitutions. Second, Officer Ah Yat's testimony was insufficient in establishing that the speed check cards were prepared in the regular course of equipment maintenance as opposed to providing evidence in speeding cases.

## A.

In *Melendez–Diaz,* the U.S. Supreme Court said:

[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, *or accuracy of the testing device,* must appear in person as part of the prosecution's case.... Additionally, documents prepared in the *regular course of equipment maintenance* may well qualify as nontestimonial records.

557 U.S. at —— n. 1, 129 S.Ct. at 2532 n. 1 (emphases added). As noted before, in order to lay a foundation for the result of an out of court test, there must be expert testimony that the test was based on the "proper application of valid techniques grounded in valid underlying principles." *Long,* 98 Hawai'i at 354–55, 48 P.3d at 601–02,. Such expert must appear in person. Hence, insofar as the "accuracy of the testing device" in *Melendez–Diaz* involves evidence that the test employed was reliable, *see, e.g., Werle,* 121 Hawai'i at 286, 218 P.3d 762, such evidence must be presented through an expert witness.

As to whether the testing device is accurate, we have held that such proof may be afforded through a witness. *Werle,* 121 Hawai'i at 286, 218 P.3d at 774 (holding there was insufficient evidence "to establish the foundational reliability of [Petitioner's] blood alcohol test results under" *Montalbo* because testimony of a technician who "was qualified to describe the procedures he followed to obtain [the petitioner's] blood alcohol test results, and state the test results as shown by the testing instrument" was not qualified to testify as to the "general reliability and acceptance of the [radiative energy attenuation] chemical testing procedure"); *Assaye,* 121 Hawai'i at 213, 216 P.3d at 1236 (2009) (holding that no proper foundation was laid for admission of laser gun speed reading because the record did not indicate that "tests the [officer] testified to conducting [on the laser gun] were recommended procedures by the manufacturer for the purpose of showing that the laser gun was in fact operating properly"); *Manewa* 115 Hawai'i at 354, 167 P.3d at 347 (holding there was no proper foundation laid for the admission of drug weight because prosecution failed to establish that technician had any expertise in calibrating balance of drug scale or "that the balance had been properly calibrated by the manufacturer's service representatives" or "that there was an accepted manufacturer's established procedure for 'verify[ing] and valid[ing]' that the balance was in proper working order" and the technician followed the procedure); *Wallace,* 80 Hawai'i at 412, 910 P.2d at 725 (holding that "prosecution failed to lay a sound factual foundation that

the ... 'balance was accurate'" because there was "no reliable evidence showing [it] was in proper working order" where "[t]he service representative did not testify at trial regarding his calibration of the balance").

We have indicated, as to maintenance records, that the accuracy of the testing device may be established under the business records exception to the hearsay rule. *Assaye*, 121 Hawai'i at 214 n. 8, 216 P.3d at 1237 n. 8 (noting the absence of the speed check laser gun calibration logs and testimony by officer that such logs would be kept in department files, but were not submitted into evidence); *Manewa*, 115 Hawai'i at 357, 167 P.3d at 350 (holding that no proper foundation was laid showing that a drug scale was properly calibrated because the lab technician "did not know how to calibrate or service the balance, no service representative testified as to his or her calibration of the balance, *and no business record was introduced into evidence in lieu of such testimony*") (emphasis added); *Wallace*, 80 Hawai'i at 412 n. 28, 910 P.2d at 725 n. 28 ("[A] document provided by the calibrating agency showing the name of the person calibrating the balance, that he was qualified, and that the balance was calibrated on a certain date may well have fallen under the hearsay exceptions relating to business records, but this was not offered into evidence.") (Brackets omitted.). These precedents, if necessary to apply, would control under our case law and I do not discern any material basis for an extended discussion of *Melendez–Diaz* under the facts of the case. The accuracy of the testing device and the maintenance records are not implicated in this case inasmuch as, as indicated *supra*, the test result concerning the speedometer was inadmissible and, consequently, questions concerning the accuracy of so-called maintenance records would not be reached.

### B.

Second, while *Melendez–Diaz* stated that "documents prepared in the regular course of equipment maintenance *may well qualify* as nontestimonial records[,]" —— U.S. at —— n. 1, 129 S.Ct. at 2532 n. 1 (emphasis added), I do not agree with the majority's conclusion that "[t]he speed check card at issue here was created in a non-adversarial setting in the regular course of maintaining [Officer] Ah Yat's police vehicle, five months prior to the alleged speeding incident[and a]ccordingly, it is non-testimonial in nature." Majority opinion at 374, 227 P.3d at 540.

The majority's assumption that "the speed check card at issue here ... is non-testimonial in nature," is not warranted inasmuch as the facts in the record are ambiguous. A review of Officer Ah Yat's testimony at trial is inconclusive as to whether the purpose of the speed check was part of the regular maintenance of the police department vehicles, or for the purpose of providing reliable evidence in speeding cases. *See, e.g., People v. Carreira*, 893 N.Y.S.2d 844, 2010 WL 254901, at *5 (N.Y.City Ct. Jan.12, 2010) (holding that certificates of analysis of breath alcohol simulator solution and of the inspection, maintenance, and calibration of a breath test instrument could not be considered typical business records and therefore non-testimonial under *Melendez–Diaz*, in part because "the entire purpose of calibration and solution testing is to provide reliable evidence for prosecuting [driving while intoxicated offenses]" and, "[b]ut for the need to prove [driving while intoxicated] in court, these procedures and records would not exist"). The relevant portion of Officer Ah Yat's testimony during direct examination to this issue is as follows:

Q And describe to the Court what is a speed check?

A A speed check is verification which is taken care of by the vehicle maintenance section. They take the vehicle to the shop to calibrate the actual speed of the car with the speedometer.

Q And (indiscernible)?

A *It's done so that we can, we know that our speedometers are accurate, and when we pace vehicles at a certain speed, we know for sure that the vehicle is going that speed.*

Q Okay. And how often are these [speed checks] done?

A Once a year.

Q And how long are they good for?

A One year.

Q *And is the speed check conducted in the regular course of maintaining HPD vehicles?*

A Yes, ma'am.

(Emphases added.) Officer Ah Yat testified that the speed checks were specifically done so that "[police officers] know that [their] speedometers are accurate, and when we pace vehicles at a certain speed, we know for sure that that vehicle is going that speed." Officer Ah Yat agreed that the speed checks "are done and are made so that officers ... can use them in prosecuting speeding cases, or [ ] use them in court." Based on the record, this court cannot reasonably conclude that Officer Ah Yat's testimony established that the speed check card was made in a "non-adversarial setting in the regular course of maintaining [Officer] Ah Yat's police vehicle[.]" Majority opinion at 374, 227 P.3d at 540. This question, significant to the application of our constitutions, should be resolved in a case clearly establishing the pivotal facts; not in a case, such as this one, where the record is unclear.